BITUMINOUS CASUALTY CORPORA-
TION, Appellant,

v.

Jewell SANDERS, Appellee.

No. 3925.

Court of Civil Appeals of Texas.

Waco.

Oct. 26, 1961.

The Kempers, Houston, for appellant.

Jim S. Phelps, Houston, for appellee.

TIREY, Justice.

This is a workmen's compensation case. The verdict was favorable to the employee and found that his injuries were permanent, and further found that there was not another employee of the same class as the plaintiff working substantially the whole of the year immediately preceding the 20th day of November 1958 in the same or similar employment, in the same or neighboring place. It fixed his average weekly wage at $50, and found that he was entitled to a lump sum settlement. The Court found, under the verdict of the jury, that plaintiff is entitled to compensation at the rate of $30 per week for a period of 401 weeks, less the amount of compensation previously paid, same being 12 weeks at $18 per week; that as of the 29th day of September 1960, there was 97 weeks of compensation that was past due upon which plaintiff was entitled to 4% interest per annum, and that there were 304 weeks of further compensation due upon which defendant was entitled to 4% per annum discount, and further found that plaintiff was entitled to recover on the 29th day of September 1960, the sum of $10,-945.89, and fixed the attorney's fees at $2,-761.47, being one-fourth of the sum, and decreed accordingly. Defendant seasonably filed its amended motion for new trial, and it being overruled perfected its appeal to the Beaumont Court, and the cause is here on transfer. It was stipulated that plaintiff had not worked in the employment in which he was working at the time of his accident for the same or other employer for substantially the whole of the year immediately preceding November 20, 1958.

Appellant assails the judgment on five points. They are substantially to the effect that the Court erred: (1) In rendering judgment for plaintiff based upon the jury's answer to the effect that the plaintiff's injuries were permanent, because there is no evidence of probative force in the record to sustain such answer; (2) Because the answer of the jury that his injuries were permanent was against the greater weight and overwhelming preponderance of the evidence; (3) Because the jury failed to find that plaintiff suffered only partial incapacity, because there was no evidence of

probative force that justifies a finding in excess of some partial incapacity to the plaintiff; (4) And the jury's failure to find partial incapacity of the plaintiff is so against the greater weight and overwhelming preponderance of the evidence as to be clearly wrong; and

"(5) * * * in refusing to grant this appellant a new trial because the foreman was guilty of material misconduct in that while the Jury was considering its answer to Special Issue No. 13, inquiring what sum of money would be fair to both parties herein as the average weekly wage of the plaintiff, he told the others that at $40.00 per week the plaintiff would only get about $20.00 thereof since his lawyer was entitled to his fee therefrom, so that they improperly received during their retirement highly material testimony other than from the witness stand in open court."

A statement is necessary. Plaintiff brought his suit to recover benefits for accidental injuries to his back, shoulders and neck sustained on November 20, 1958, while in the course of his employment. Evidence was tendered to the effect that plaintiff was 42 years of age at the time of the trial; that he had worked for about 6 months prior to the date of the accident for John Bass as a wood-hauler; that on November 20, 1958, he sustained a cut lip and began to hurt in his neck and lower back while hauling pulpwood in San Jacinto County for Mr. Durham; that plaintiff was taken to the hospital by ambulance where he saw Dr. Gardner, who treated him, and he remained there for three days; that after his release he saw Dr. Gardner at least three times for further treatment over the next three weeks; that he was sent to Dr. Markewich in Houston by his attorney, and that this doctor saw plaintiff a total of five times from December 1958 to mid September 1960. Plaintiff also saw Dr. Price for the defendant, and Dr. Martin, both of Houston; that plaintiff worked for one Von Pitman for better than nine months

after March 1959, and was paid $2.50 per day, working two, three and four days per week; that he thereafter became a block-setter for Jesse Brown near Shepherd, Texas, riding a carriage some six to eight months; that he quit this job because his neck and back pained him so much one month prior to the trial; that Brown paid him $9 per day; that about three weeks prior to the trial he then again worked as a hauler for Richard Williams for several days; that he didn't know before the accident that he had arthritis in his spine, but had been so informed by the doctors after the injury. Plaintiff received no cuts requiring stitches, nor any broken bones; that he did not ask Brown to send him to a doctor, but he did take off several times to see Dr. Markewich; that he has not been given any braces, crutches or any other aid by any of the doctors.

Dr. Markewich testified substantially to the effect that the time he first saw Jewell Sanders, was on the 3rd day of December 1958; that he was 41 years old, colored male, and gave a history to the effect that plaintiff had been involved and injured in an accident on the 20th day of November 1959 while working for a pulpwood contractor, John Bass; that he stated that the truck he was in was involved in an accident; that the truck ran into a ditch, and the wood on the truck piled up on him and injured his chest, neck and back; that he was hospitalized in Livingston, Texas, and from that time on he had been under treatment by physicians in the area and had not been doing any work, and that he had never had such a similar injury before; that when he saw him on December 3, 1959, he was complaining of pain in his chest and in his back and neck, and pain in his lower back; he stated that the pain kept him from resting at night and he could not do very much bending, or lifting, or straining because of the pain; that a physical examination of the employee revealed a tenderness over the back of the cervical spine, which was the neck vertebrae, with some slight amount of spasm of the muscles on each side of

the cervical vertebrae; that motions of the neck were very painful on attempted forward motion or right and left motion or backward extension of the neck, and there was some limitation of the extension to the back; that examination of his chest revealed just a generalized tenderness over the upper part of the chest well, but that he could see no bruises or contusions, or any cuts or lacerations; that the lungs on listening with the stethoscope were normal; that further examination revealed tenderness in the lumbosacral area of the back which is at the lower end of the lumbar spine at the level of about the hip joint where the sacrum of the spine joins the lumbar spine, just about hip level; that there was tenderness there and there was moderate muscle spasm in that area, that is on the muscle group or the bunch of muscles on each side of the spine, on both sides; that motion of the back was painful at this time and was limited about 30 to 40 per cent. That means he had about 60 or 70 per cent of what is considered normal motion of the back; that the rest of the physical examination was essentially negative; that in testing for various nerve injury or neurological findings, any numbness or sensory changes and reflexes, all were negative; that he sent him to Dr. Tyner for an X-ray of his back. The X-rays were admitted in evidence, and Dr. Markewich testified to the effect that he could read the X-rays, and he pointed out in detail as to what the X-rays showed as to plaintiff's neck and back; that after his physical examination, and examination of the X-rays, his diagnosis was: "A cervical strain which is a neck strain. There was tenderness over the chest which I said here, No. 2 diagnosis, probably a residual bruise of the chest manifested by tenderness and pressure over the front of the chest. There was a lumbosacral strain, that means in the lower back that I described before, and the X-ray findings of this arthritic condition and the congenital condition that I demonstrated, that failure of fusion at the fifth lumbar vertebra." Dr. Markewich saw him again on the 3rd of September 1960, which was some 12 days before the trial, and he testified: "Still unable to do any work. He had severe complaints in regard to his neck. I couldn't demonstrate too much—I could demonstrate pain on motion, but no limitation, and that's the same thing applied to the lower back, too, but he's unable to do any work from the history, and he says if he tries to, he can't last very long, his back kicks up, some days better, some days worse, but that at this time mostly complaints in regard to his neck and his back." He further testified:

"Q. That much arthritis couldn't accumulate between November the 20th when the accident occurred and December whatever it was, December the 3rd * * *? A. No. That amount of arthritis, especially those long spurs, —Well, the congenital condition has been there since he was born, but the arthritic changes, especially the spur formation, if I had to estimate a time, how long it took them to form, I would say it was a minimum of somewhere around five years or even maybe a little bit more or a little bit less, but it takes some time for those things to keep building up.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Now, Doctor, will you explain to us how a person with arthritis in his back and if he has a lick, or a blow, or what you doctors call 'trauma' or arising out of an accident, how that accelerates and causes a back which has arthritis in it which has been not symptomatic to become symptomatic? A. Well, I can't explain the exact physiology of how it happened, but it does occur that a man who doesn't have any trouble with the back even though he's got arthritic changes in X-ray will go along and have no trouble, and then he gets injured in some way and his arthritic changes or back begins to *both* him, or aggravates it, or sets it off where he starts progressing faster than the normal rate that it would progress as he gets older.

"Q. Now, Doctor, once this arthritic condition in a man's back is triggered off or incited, as you doctors sometimes call it, what does that mean when you trigger it off or when you incite this arthritic condition and it becomes symptomatic? A. Well, it's an aggravation of a previously existing condition which was quiet, quiescent.

"Q. And can that condition, that aggravation and excitement or acceleration of this arthritic condition that a person has in his back, can that be caused by such a type of accident that Jewell Sanders was in? A. It can.

"Q. Now, Doctor, if Jewell Sanders had worked hard all of his life and had worked practically all of his life and hardly ever out of work, and had never had any back trouble at all prior to an accident that occurred on November the 20, 1958, and assuming it to be the truth and fact that on that occasion a truck going some thirty or forty miles an hour with 330 feet of wood, pulpwood, on the back of the truck went down into about a four-foot ditch and all this lumber and everything came over on them and pushed them down into where they were wedged down into the truck, took them some twenty or thirty minutes to get the doors open so they could even get them out of the truck, and assuming, since that time, Doctor, that he has been having continuous trouble with his back and neck, what in your opinion, Doctor, would be causing the trouble that he's having with his back and his neck? A. Well, the accident as stated on November the 20th, at least, that started off the trouble— * * * —or precipitated it, I would say.

*     *     *     *     *     *

"A. Precipitated. Well, two things. The accident caused the back trouble with the spasm that he had, and the aggravation of the arthritis is continuing the trouble. The original probably muscle or soft tissue injury probably had gone away, but the arthritic condition lying underneath is not letting it clear up.

"Q. * * * when a man gets this arthritic condition in his back, does he get well, or is that a permanent thing * * * ? A. No. The condition in his back, the arthritic condition, is permanent.

"Q. This arthritis that he has got in his back is not going to disappear, is it, Doctor? A. No. Chances are it will probably progress. It usually does.

"Q. Well, in all medical probabilities, it will progress and get worse? A. That's right.

"Q. Now, * * * after looking at the X-rays and if Jewell Sanders came to your office for a pre-employment medical examination and had the complaints that he had at the time you saw him last, on the 3rd of September, 1960, would you pass him for a pre-employment medical examination, Doctor, to get out and do the work, the usual work that an ordinary worker has to do? A. No, not the ordinary work, or all work, or heavy work. He probably could do some lighter type of work.

"Q. * * * has Jewell Sanders at this time reached the maximum recovery that he has as far as this accident and this condition is concerned? A. Oh, after close to two years, I think so."

A summary of appellee's work record before the accident, shows: (1) Southern Pacific Railroad, section hand, 8½ years; (2) Gulledge Construction Company, construction hand 1½ years; (3) Ernest Johnson, log hauler, 1½ years; (4) Warren Griggs, bricklayer, 3 or 4 weeks; (5) Jesse Brown, log tripper, 2 or 3 months; (6) Frank Green, trimmer in front of power

saw, 3 months; (7) J. N. Dunham and Son, Inc., and John Bass, log hauler, 10 months.

We think the record shows without dispute that prior to the accident plaintiff was a hard-working man, with a good work record.

Evidence was tendered to the effect that since the accident on November 20, 1958, until the trial during the third week of September 1960, some 20 months had elapsed between the accident and the trial of the case on its merits; that during this time plaintiff worked for Jesse Brown from February 6, 1960, to May 28, 1960; that during the time he worked for Mr. Brown he did not work full time, and that he laid off some 3 times because of his injury. Mr. Brown testified that there was only one week that appellee worked as much as 3 days in any one week; that during the 17 weeks plaintiff worked for Mr. Brown he made in all $184.02, while his wage was $1.13 per hour, or $9 per day. He further testified that during the time he worked for Mr. Brown he had to get off some 3 or 4 times on account of his neck hurting him; that he told Mr. Brown he had to go home, and one day he quit at 2 o'clock and went to bed. He further testified that sometime while he was working that the pain was sometimes bad, and that he had to quit the job with Mr. Brown because his back and neck hurt him so bad he had to quit. Testimony was tendered to the effect that plaintiff had several different jobs after he was hurt in the 20 month period between the date of the injury and the trial, but that he was unable to stay on the job and voluntarily quit because he said that he had so much pain that he could not do the job and that he did go home and go to bed. We think the record reveals that the plaintiff did very little work from the time of his injury to the date of the trial, and that the jury was authorized to believe and find from all the evidence and surrounding circumstances that the plaintiff was not working because he was not able to work, and could not do it because of the pain he was suffering.

Dr. Price, an orthopedic surgeon, testified to the effect that plaintiff had a lot of arthritis in his neck; that the lower part of his neck showed considerable arthritic changes; that there was a flattening of the curve in his neck; that this degenerative change lead to the muscle spasm, and that the muscle spasm being the thing that actually produced the flattening; that he found "limitation of motion, yes, sir, due to the motion that was cut down in these joints"; that if the plaintiff had been sent to him for pre-employment medical examination, and that if he had an X-ray of him and saw this arthritis in his neck and in his back, and that if the plaintiff told him he was having pain on bending in his neck and he had no muscle spasm at all in his back, "I would not pass him."

"Q. * * * he did tell you he was having pain when he was in your office, didn't he? A. That's true."

Dr. Martin, an orthopedic surgeon, testified to the effect that he had had the employee X-rayed, and agreed to a finding that showed:

"Examination of the cervical spine, that means the neck, in multiple projections shows evidence of marked degenerative changes of the cervical spine manifested by straightening of the cervical curve and thinning of the C-4, C-5, and C-6 interspaces. There is marked thinning at C-6, particularly, and there is evidence of attempts at hypertrophic bridging between the various levels of C-4 through C-7. There is nothing to suggest evidence of fracture of subluxation. There appears to be some posterior lipping at the C-6 interspace on both sides. Nothing else of significance is seen."

That the X-ray showed some arthritic changes, and that the pain that the employee complained of "could possibly have come from some aggravation of the arthritic changes in his neck." That if the

employee came to his office for a pre-employment medical examination, and "If I were the examining physician, not knowing what went on with this man, I would not pass him. As a doctor who has had a chance to completely examine him and know of his history, I would pass him." He further testified to the effect:

"A. * * * if a man comes in complaining of pain in his back or neck, even if the X-rays don't show arthritis, they won't hire him.

* * * * * *

"A. They won't pass him.

* * * * * *

"A. * * * we couldn't find any positive findings or physical findings to substantiate his complaints of his neck pain to try to tie it in with the X-ray findings. The physical findings were just not there. He has the subjective complaint, he has the complaint of his hurting there, but we could not find any evidence to substantiate his complaint."

Over against the testimony of appellant's doctors, we have the testimony of Dr. Markewich, and the plaintiff's testimony, plus the testimony of those who worked with him, plus plaintiff's work-record for a period of several years prior to the accident where he did various types of hard work from day to day, and so far as this record goes, without any complaint of pain in his back or neck or anywhere else. Since the accident we have his work-record, which is without dispute, and we have the testimony of the witnesses Brown, Williams and Von Pitman, and their testimony shows that the employee did work for a short time, and did complain of pain in his back and neck, and would quit and go home, and go to bed, and there is nothing in the testimony of these men for whom and with whom the employee worked to indicate that the employee was malingering. In addition to that testimony, we have

the testimony of the employee himself, which sounds reasonable, and appears to be free from any suspicion that he was malingering. At least it so impressed the jury. It is true that if the jury had chosen to follow the testimony of appellant's doctors it could have found that the employee had only partial disability, but with the work-record of the employee before them, both before and subsequent to the injury, the jury chose to follow the testimony of Dr. Markewich, and to finds that appellee had suffered total and permanent disability. Our Supreme Court in Hood v. Texas Indemnity Ins. Co., 146 Tex. 522, 209 S.W. 2d 345, 346, re-announced the rule in Texas, which is: "Opinion testimony does not establish any material fact as a matter of law." See also Consolidated Cas. Ins. Co., v. Baker, Tex.Civ.App., 297 S.W.2d 706, n. r. e., and cases there cited. We have carefully reviewed all the testimony shown by this record, and we cannot honestly say that the verdict of the jury is so against the great weight and preponderance of the evidence as to be manifestly unjust. In re King Estate, 150 Tex. 662, 244 S.W.2d 660. See also "No Evidence" and "Insufficient Evidence", by Justice Calvert, (Reprint from April, 1960, 30 Tex. L.Rev. 803). Our view is that since the employee did sustain an injury in the course of his employment, that a consideration of all the evidence tendered under all the facts and circumstances surrounding the employee as shown by the record is that the preponderance of the evidence, under all the facts and circumstances here shown, supports the jury's verdict. It follows that appellant's Points 1, 2, 3 and 4 are overruled.

Appellant's 5th Point is that the Court erred in failing to grant a new trial, "because the foreman was guilty of material misconduct in that while the Jury was considering its answer to Special Issue No. 13, inquiring what sum of money would be fair to both parties herein as the average weekly wage of the Plaintiff, he told the others

that at $40 per week the Plaintiff would only get about $20 thereof since his lawyer was entitled to his fee therefrom, so that they improperly received during their retirement highly material testimony other than from the witness stand in open court."

We have carefully considered the testimony tendered on the amended motion for new trial on which the foregoing point is based, and we are of the view that it fails to present any error. We are of the further view that a recitation of the testimony would not be of any precedential value and for that reason we do not set it out or make any summary thereof. Suffice it to say that the testimony did not impress the trial judge, and we approve his action. We think we should say that the question tendered is not new, and this point is ruled by the pronouncement of our Supreme Court in King v. Federal Underwriters Exchange, 144 Tex. 531, 191 S. W.2d 855. See also opinion by Supreme Court in Texas Employers Ins. Ass'n v. Hatton, 152 Tex. 199, 255 S.W.2d 848. We are of the further view that appellant has not brought itself under the Rule of 327, Texas Rules of Civil Procedure. See also Rules 434 and 503, TRPC. Appellant earnestly insists that it has not had a fair trial in this cause. We see no merit in this contention whatsoever. The trial court gave appellant a full opportunity to develop its defense, and we think appellant did a good job in so doing, because it tendered in evidence two outstanding orthopedic surgeons whose testimony was to the effect that the claimant's injuries at most were only partial, but the jury did not see fit to accept their view, and after all, it had the duty to pass upon the facts. We are of the view that appellant has had a fair and impartial trial under the record before us, and each of its points of error here assigned is overruled.

Accordingly, the judgment of the Trial Court is Affirmed.