HIRAM DeFRIES, Claimant-Appellant, *v.* ASSOCIATION OF OWNERS, 999 WILDER, Employer-Appellee, and PACIFIC INSURANCE COMPANY, LTD., Insurance Carrier-Appellee

NO. 5641

OCTOBER 6, 1976

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR AND KIDWELL, JJ.

OPINION OF THE COURT BY RICHARDSON, C.J.

Claimant-appellant appeals from an order of the Labor and Industrial Relations Appeals Board denying workers' compensation benefits for a partially disabled right knee.

It is undisputed that claimant stumbled and fractured the big toe of his right foot on August 30, 1970, in the course of his employment as a security guard. The factual issue presently in dispute is whether or not the same stumble also aggravated or accelerated an osteoarthritic condition in claimant's right knee.

At the appeals board hearing, claimant testified that, while running after a suspicious person, he failed to notice a step up to a higher floor level so that he struck his foot against the face of the step, fracturing his toe and also striking his knees on the floor, although his hands helped break the impact of the fall. The employer does not dispute that claimant stumbled and fractured his toe, but does question whether claimant's knees struck the ground. It is undisputed that claimant then weighed approximately 285 pounds and was 63 years old.

The Employer's Report of Industrial Injury and two Physician's Reports to the Division of Workmen's Compensation, all filed during the latter months of 1970, refer only to the fracture of the right big toe and make no mention of impact or injury to the right knee. However, one of the physician's reports does make reference to "[claimant's] fall."

At the appeals board hearing, claimant stated that his right knee did not hurt until about a week after the accident; that the pain then felt "very minor"; that he couldn't remember whether or not he mentioned such pain to the doctor

then treating the fractured toe; that the knee thereafter bothered him off and on, perhaps once a month; and that he treated it at home with a heating pad and ointment. He further testified that on July 21, 1972, approximately two years later, while in the continued employ of appellee, his right knee seemed to lock as he was stepping down from his work stool and he was forced to limp because of the pain. It is undisputed that on the next day, July 22, 1972, claimant obtained treatment for the knee from Dr. Shimamura, the same doctor who had treated the broken toe. At the hearing claimant stated that, at this July 22, 1972 office visit, as far as he could remember, he did not mention the 1970 accident to the doctor. He explained that he assumed Dr. Shimamura already knew that he had struck his knees in the 1970 stumble and fall. In a letter in evidence at the hearing, Dr. Shimamura wrote that the first time claimant told him that the injury to the right knee was related to the 1970 stumble was on September 8, 1972.

Claimant does not deny that he may have suffered a latent osteoarthritic condition in the right knee prior to the 1970 stumble, but he does aver that he felt no pain prior to the stumble. He contends that the stumble aggravated or "triggered" any degeneration that may have existed prior to the stumble.

Dr. Richard Dodge, who had been treating claimant since October 1972, was called as an expert witness for the employer. With respect to claimant's testimony that he had not noticed pain in the right knee until about a week after the stumble, Dr. Dodge testified that it was "not the usual case" for pain to be so slow in manifesting itself; that the week's delay before pain was noticed "raises questions in my mind"; that it "would be possible, but it would be very strange for him to go a week after a fall" without any pain or mention of pain to his doctor. However, other testimony by Dr. Dodge is more favorable:

"Q [Chairman of Appeals Board] I know anything's possible but based on medical probability, what is your opinion? Probability, now.

"A [Dr. Dodge] I know, I know. My opinion is that it [injury to the knee in the 1970 stumble] couldn't have been very severe, but it could have happened. If he did have a fall it could have happened and he could have gone on and treated it at home until it became severe enough to seek medical help in 1972 . . . ."

On recross examination, when Dr. Dodge was asked whether he saw anything suspicious or unusual about claimant's failure to seek medical treatment for his knee until almost two years after the 1970 stumble, Dr. Dodge replied:

"No. . . . I have seen many, many people with arthritis who treat themselves at home. I know by experience that they do as well at home as they do by going to the doctor periodically."

Even though claimant did see Dr. Shimamura a number of times during 1970-1972 for other ailments, Dr. Dodge still saw nothing unusual about failure to mention minor knee pain to Dr. Shimamura during that period:

"Q . . . If a person, let's say in your own practice, has experienced minor pains on an intermittent basis, once a month like that, do they ordinarily mention this to you as the doctor if they're coming to you for something else?

"A I don't think so. . . . [T]he dominant factor for which they come to me is the important thing unless you go into detailed history. If it is severe, they'll usually mention it too."

Letters from two other doctors were also made part of the record. Dr. Shimamura, who had treated claimant both after the 1970 stumble and after the 1972 knee-locking incident wrote, with respect to treatment of the 1970 stumble:

"I don't remember him mentioning about his right knee which was supposedly injured at the same time [as his right big toe]. However, there is a possibility that he did injure his knee and made no mention of it."

A letter from the employer's medical expert, Dr. Luke, concludes on the basis of a single examination:

"Based on the facts known about this case as rendered by the patient and based on this examination, it is my opinion

that the patient's right knee problem has nothing to do either by way of injury or by way of aggravation in so far as the accident of 1970 is concerned. It is only by retrospect and hindsight that the patient is trying to establish a causal relationship for purposes of putting in an industrial claim."

Dr. Luke's letter also mentions alleged statements by the claimant that appear inconsistent with portions of claimant's testimony before the appeals board:

"The patient says that he was chasing a culprit. . . . He claims that he thinks he struck the right knee. He is uncertain about this. . . . He says that he did not strike the right knee but tensed the right knee. He seems to be changing his mind as to what occurred concerning the right knee at all. . . .

"In July 1972 the right knee started to hurt for the first time. . . . He says that he put in an industrial claim alleging that the right knee was injured in the accident of 8-70 solely because he had no trouble with the right knee before."

A portion of claimant's own testimony could also be read as impeaching his claim that the right knee gave him mild, intermittent pain beginning about a week after the 1970 stumble. With respect to the 1972 incident in which claimant's right knee seemed to lock as he got off his stool at work, claimant's attorney asked him:

"Q  Was that the first time [the right knee] started hurting?

"A  Yes.

"Q  You had no pain in that knee before that time?

"A  Oh, I had, but at home I was using the heating pad with this rubbing ointment . . . ."

Undeniably, there was at least some evidence before the appeals board which might be interpreted as weakening or impeaching claimant's testimony that he struck his knee against the floor in the 1970 stumble and that his knee began hurting about a week later. A key question on appeal is whether or not such impeachment was sufficient under all the

facts of the case to support the appeals board's verdict against claimant.

## The Appeals Board Decision

Although the Director of the Department of Labor and Industrial Relations had determined after an administrative hearing that claimant's right knee injury was compensable, the appeals board reversed. It is clear from the board's written decision that its primary reason for reversing the director was its conclusion that claimant's testimony was not credible.

In its decision, the board noted that claimant had limped decidedly at the hearing and had testified that his limp had been even worse on the day he first consulted Dr. Dodge in 1972; and yet, the board noted, Dr. Dodge had not recorded claimant's limping in his 1972 medical records, even though Dr. Dodge testified that he thought he "surely would have" made a note in 1972 of limping so obvious as the limping at the hearing. No one disputes that claimant was suffering from objectively manifested osteoarthritis by the time of his first consultation with Dr. Dodge in 1972, but the board evidently believed that claimant's testimony, by reason of deliberate exaggeration or confused memory, inaccurately described the extent of the 1972 limp. From this the board apparently drew the inference that claimant's testimony on material issues was less credible.

The board's decision also noted that claimant had emphatically, and inaccurately, denied having filed any workers' compensation claim prior to 1970; yet the board found the record to show that claimant had filed a claim for his *left* knee in 1962.[1] The board found it difficult to believe that the

---

[1] The board's characterization of the record is not wholly accurate. The record shows that (1) in 1955 claimant filed a workers' compensation claim for "multiple contusions of left flank and forehead" arising from a fall down some stairs, and (2) in 1962 the 1955 claim was reopened, with claimant complaining of pain in the left knee. There is no record of the actual filing of a claim in 1962.

claimant, after prior experience with a claim involving a knee, would fail to claim or mention an injury to his other knee in 1970, "particularly in light of his testimony that his right knee bothered him to the extent that he subjected himself to heat treatments at home."

The board further noted that Dr. Dodge, who first had flatly testified that the right knee injury was triggered by the 1970 stumble, modified his opinion during the hearing after being told that the claimant had failed to report the knee injury to any doctor between 1970 and 1972, during which period claimant had seen Dr. Shimamura on a number of occasions. Dr. Dodge testified that causation did not appear as probable to him now as it had before.

The board found that, in general, conflicts between claimant's testimony and evidence in the record "cast a very dark shadow on his credibility." The board concluded that in light of claimant's "general course of conduct" and the "evident lack of credibility" in his testimony, no connection existed between the 1970 stumble and claimant's right knee injury.

### Standard of Review on Appeal

In *De Victoria v. H & K Contractors*, 56 Haw. 552, 556, 545 P.2d 692, 696-97 (1976), this court held that appeals from the Labor and Industrial Relations Appeals Board are governed by Hawaii's Administrative Procedure Act, which provides in pertinent part that:

"[T]he court may . . . reverse . . . the decision and order [of an administrative body] if . . . the administrative findings, conclusions, . . . or orders are:

.         .         .

(5) *Clearly erroneous* in view of the reliable, probative, and substantial evidence on the whole record . . . ." HRS § 91-14(g) (1975 Supp.) (emphasis added).

Under the clearly erroneous standard, this court will reverse findings by the appeals board if this court is left with the definite and firm conviction that a mistake has been made. *De*

*Victoria, supra,* 56 Haw. at 557-58, 545 P.2d at 697-98.

The clearly erroneous standard gives the reviewing court greater leeway to reverse a lower court's findings than the substantial evidence test applicable to review of jury verdicts (including jury verdicts in criminal cases)[2] and administrative fact-finding under the *federal* Administrative Procedures Act.[3] Under the clearly erroneous standard, the reviewing court *will reverse*

> "[i]f the findings [by the lower court] . . . are against the clear weight of the evidence or [if] the appellate court otherwise reaches a definite and firm conviction that a mistake has been made, . . . *even though there is evidence* [supporting the findings] *that, by itself, would be substantial.*" Wright & Miller, Federal Practice and Procedure: Civil § 2585 (emphasis added).[4]

### Burden of Proof

In reviewing the decision by the appeals board, this court must also take into consideration the burden of proof imposed upon the employer by HRS § 386-85:

> "Presumptions. In any proceeding for the enforcement of a claim for compensation . . . it shall be presumed, in the absence of substantial evidence to the contrary;
>
> "(1) That the claim is for a covered work injury."

This section has been construed in numerous Hawaii cases. The cases have liberally construed the statutory language in order to effectuate the humanitarian purposes of the workers' compensation act. In general, it has been found that

---

[2] State v. Kekaualua, 50 Haw. 130, 132, 433 P.2d 131, 133 (1967).

[3] 5 U.S.C. § 706(E) (1970).

[4] For a fuller explanation of the difference between the substantial evidence test (traditionally applicable to jury verdicts) and the clearly erroneous test (traditionally applicable to equity findings), *see generally* Wright & Miller, *supra:* Civil §§ 2571, 2585.

the workers' compensation act "cast[s] a heavy burden on the employer." *Akamine v. Hawaiian Packing & Crating Co.*, 53 Haw. 406, 409, 495 P.2d 1164, 1166 (1972). The "substantial evidence" burden imposed on employers by § 386-85 entails not only a burden of going forward with the evidence but also a burden of ultimate persuasion: *De Victoria v. H & K Contractors*, supra, 56 Haw. at 561, 545 P.2d at 699; *Akamine v. Hawaiian Packing*, supra, 53 Haw. at 408, 495 P.2d at 1166; *Royal State Nat'l Ins. Co. v. Labor & Industrial Relations* Appeal Board, 53 Haw. 32, 35, 487 P.2d 278, 280 (1971); and *Acoustic, Insulation & Drywall, Inc. v. Labor & Industrial* Relations Appeal Board, 51 Haw. 312, 316, 459 P.2d 541, 544 (1969).

"Substantial evidence" as used in § 386-85 means a high quantum of evidence. This is evident from Akamine *v.* Hawaiian Packing, *supra,* in which this court, after rigorously examining the extensive testimony offered by two medical experts on behalf of the employer, concluded that the experts' testimony was insufficiently relevant and probative in "net weight" to qualify as "substantial evidence" under the statute. 53 Haw. at 410, 495 P.2d at 1167.

However, the court in *Akamine* did not rely solely on the "substantial evidence" requirement of § 386-85 in reaching its results. *Akamine* further holds that the broad humanitarian purpose of the workers' compensation statute *read as a whole* requires that all reasonable doubts be resolved in favor of the claimant:

"[I]f there is *reasonable doubt* as to whether an injury is work-connected, the humanitarian nature of the statute demands that doubt be *resolved in favor of the claimant."* 53 Haw. at 409, 495 P.2d at 1166 (emphasis added).

"The beneficent and liberal purposes of the statute require that *doubts be resolved in favor of the claimant."* 53 Haw. at 414, 495 P.2d at 1169 (emphasis added).

This language is consistent with the prior statement by this court that: "It is the prerogative of the legislature to give the employee *every benefit of a doubt*," *Acoustic, Insulation & Drywall v. Labor Board, supra*, 51 Haw. at 316, 459 P.2d at 544 (emphasis added).

In *Akamine*, this court reversed an appeals board verdict for the employer. We concluded that there was an absence of substantial evidence to support the employer, even though one of the employer's expert medical witnesses had definitely concluded that the claimant's heart attack was unrelated to his work activity and that the work activity probably prolonged claimant's life; while the other expert witness, a Dr. Kuramoto, had testified that claimant's heart attack could just as well have occurred elsewhere or while sleeping in bed. 53 Haw. at 410-13, 495 P.2d at 1167-68. We noted that, in contrast to the other expert, Dr. Kuramoto would not give a definite opinion as to whether claimant's heart attack was work-related. 53 Haw. at 414, 495 P.2d at 1169. From Dr. Kuramoto's refusal to give a final opinion and from his testimony that the attack *might* have been caused by a blood clot which might have been caused by a leg cramp aggravated by work activity, the *Akamine* court concluded that there was "pervading doubt" as to the cause of the heart attack and that the prevalence of such doubt "represents a salient index of the absence of substantial evidence" to support the employer. 53 Haw. at 414-15, 495 P.2d at 1169. Taking into consideration the court's explicit statement twice in *Akamine* that doubts are to be resolved in favor of claimants, and considering that one medical expert had definitely concluded that the claimant's heart attack was unrelated to employment, the fact that the court found Dr. Kuramoto's testimony to evidence "pervading doubt" indicating "an absence of substantial evidence" makes it clear that the employer in workers' compensation cases carries a very heavy burden of persuasion. It is true that under our prior case law the employer's burden is satisfied by "substantial evidence", but *Akamine* also requires (1) that the evidence be substantial in "net weight" (53 Haw. at 410, 495 P.2d at 1167) and (2) that

in the ascertainment of net weight all reasonable doubts are to be resolved in favor of the claimant.[5]

The requirement that reasonable doubts be resolved in favor of the claimant is not unique to Hawaii. For example, in construing the federal Longshoremen's and Harbor Workers' Compensation Act, which contains language almost identical to key portions of Hawaii's statute,[6] the U.S. Court of Appeals for the District of Columbia found that the federal act reflects

> "a strong legislative policy favoring awards in arguable cases. We have frequently pointed out that since the statute 'should be construed liberally' in favor of employees and their dependents, it is 'in their favor [that] doubts, including the factual, are to be resolved.'

> ". . . 'Doubts, including the factual, are to be resolved in favor of the employee . . . .'" *Wheatley v. Adler,* 407 F.2d 307, 313-14 (D.C. Cir. 1968) (footnotes omitted).

---

[5] Royal State Nat'l Ins. Co. v. Labor & Industrial Relations Appeal Board, 53 Haw. 32, 487 P.2d 278 (1971), decided nine months prior to *Akamine,* is not inconsistent with the reasonable doubt standard, although the *Royal State* court reversed a directed verdict for the claimant with respect to a claim for a neck injury allegedly suffered in a minor car accident. On the surface, the only evidence rebutting the neck claim was a doctor's report made one day after the alleged accident, stating that the claimant "'appears to feign much of his illness, and I am not convinced that he has actual pain in the areas that he describes.'" 53 Haw. at 36, 478 P.2d at 281. However, this court's conclusion that there was sufficient evidence for the jury to deny compensation for the neck injury must be read in the context of the full *Royal State* opinion, which was primarily concerned with affirming a directed verdict for the employee with respect to a claim for a work-connected mental breakdown. Approximately two months after the alleged neck injury, claimant was dismissed from his job. On that day he visited his doctor for an alleged flare-up of the neck injury. Still later in the same day, he was admitted to a hospital, apparently for a mental breakdown. Two weeks later, while still in the hospital, he attempted to commit suicide. These and similar surrounding circumstances in the case strongly support the inference that the alleged physical injury to claimant's neck was purely psychosomatic. Under these facts, the doctor's original report concluding that the neck injury was probably feigned was sufficient basis for a jury to find non-compensability, even after resolving all reasonable doubts in claimant's favor.

[6] In particular, 33 U.S.C. § 920 (1970) provides that "it shall be presumed, in the absence of substantial evidence to the contrary — (a) That the claim comes within the provisions of [the act]."

The U. S. Court of Appeals for the 5th Circuit has found that the policy of the federal statute demands that "all doubtful fact questions . . . be resolved in favor of the injured employee . . . ." *Young & Co. v. Shea*, 397 F.2d 185, 188 (5th Cir. 1968).

The supreme courts of Arkansas and California have reached similar conclusions in construing their respective statutes:

> "[T]he Commission, in considering a claim, must follow a liberal approach and draw *all reasonable inferences* favorably to the claimant . . . . It was the duty of the Commission to draw *every legitimate inference* possible in favor of the claimant and to give her the benefit of the doubt in making the factual determination." *American Red Cross v. Wilson*, 257 Ark.647, 649, 519 S.W.2d 60, 62 (1975) (emphasis added).

> "[T]he denial of compensation benefits cannot rest upon the board's mere suspicion or surmise, in view of the policy of the law to resolve *all reasonable doubts* in the employee's favor. *Garza v. Workmen's Comp. Appeals Bd.*, 3 Cal. 3d 312, 319, 90 Cal. Rptr. 355, 360, 475 P.2d 451, 456 (1970) (emphasis added).

See also Gross *v.* Workmen's Comp. Appeals Bd., 44 Cal. App.3d 397, 402-03, 118 Cal. Rptr. 609, 612 (1975), finding that, under the California statutory policy, "any reasonable doubt [as to] whether a disability is compensable will be resolved in favor of the employee . . . . The principle seems frequently overlooked by the [workmen's compensation] board."

*Application of Legal Standards to the Facts of This Case*

This court concludes that the decision of the appeals board was clearly erroneous. We hold that, taking the evidence as a whole and giving due consideration to the opportunity of the appeals board to judge the demeanor and credibility of witnesses, there was insufficient evidence, giving the claimant the benefit of every reasonable doubt, including the

factual, for the board to conclude that the 1970 stumble neither aggravated nor accelerated the arthritic condition in claimant's right knee.

The board's conclusion that claimant's testimony lacked credibility is of course entitled to weight on appeal. If this had been a case where there existed no objective corroboration of claimant's story, then the board's finding of a lack of credibility, coupled with expert medical testimony favoring the employer, would permit the board to conclude that the claim was invalid. In this case, however, even assuming arguendo that portions of claimant's testimony were confused or fabricated, there is objective corroboration of the claim itself. It is undisputed that claimant is now suffering from osteoarthritis; that an accident occurred on August 30, 1970; that claimant was running and stumbled; that he fractured his right big toe in the accident; that he was 63 years old and weighed approximately 285 pounds; and that the next day he reported to Dr. Shimamura that he "was chasing vandal, when his right shoe came off and right big toe got caught on step . . . in his fall." It seems obvious that such a stumble, considering claimant's age and weight and the force of impact necessary to fracture his toe, also caused significant stress to claimant's knee, thereby aggravating or accelerating the arthritic condition of the knee. Under our workers' compensation statute, the slightest aggravation or acceleration of an injury by the employment activity mandates compensation. *Akamine v. Hawaiian Packing,* supra, 53 Haw. at 410-13, 495 P.2d at 1167-69.[7] Given the undisputed facts in this case and the

---

[7] The following cases from other jurisdictions hold that aggravation or acceleration of a pre-existing arthritic condition merits compensation: Great Atlantic & Pacific Tea Co. v. Cardillo, 127 F.2d 334 (D.C.Cir. 1942); Booth v. Carl F. McDougald, Inc., 116 So.2d 785 (Fla. App. 1960); Lock-Joint Tube Co. v. Brown, 135 Ind. App. 386, 191 N.E.2d 110 (1963); Johnson v. Travelers Ins. Co., 284 So. 2d 888 (La. 1973); Federated Mut'l Implement & Hardware Ins. v. Spencer, 219 Miss. 68, 67 So.2d 878 (1953); McCoy v. Bochow, 16 App. Div. 2d 722, 226 N.Y.S.2d 867 (1962); Daley v. Public Savings Life Ins. Co., 236 S.C.236, 113 S.E.2d 758 (1960); Bituminous Casualty Corp. v. Sanders, 351 S.W.2d 315 (Tex. Civ. 1961).

"Where a claimant's arthritic condition is inactive or dormant and then is lighted up by a work-connected injury . . ., then his condition is due to the work-connected injury." *De Victoria,* supra, 56 Haw. at 555, n. 2, 545 P.2d at 695-96, n. 2.

opinion by two medical experts that injury to the knee may have been caused by the stumble,[8] the rule that reasonable doubts be resolved in claimant's favor forces the conclusion that the claim in this case is valid.

The judgment of the appeals board is reversed, and the case is remanded to the board for determination of the amount of compensation to be awarded.

*Laurence D. Scott* for Claimant-Appellant.

*Vernon Y. T. Woo (Woo & Ikeda* of counsel) *Robert C. Kessner* with him on the brief for Employer-Appellee and Insurance Carrier-Appellee.

DISSENTING OPINION OF KIDWELL, J.,
WITH WHOM KOBAYASHI, J., JOINS

I respectfully dissent.

This case presents the troublesome question of the weight which should be given to a finding of the Labor and Industrial Relations Appeals Board that a claimant's testimony as to the occurrence of an injury is incredible in light of the attendant circumstantial evidence. The majority imposes on the board the obligation to resolve all reasonable doubts in the claimant's favor and concludes that the circumstantial evidence indicating fabrication of the claim was insufficient to overcome the claimant's testimony. I agree that this court may review the sufficiency of the evidence upon which the board relied in rejecting the claimant's testimony. However, I cannot concur in the majority's conclusion that the decision of the board was "clearly erroneous" and subject to reversal under the standard we confirmed in *De Victoria v. H & K Contractors*, 56 Haw. 552, 545 P.2d 692 (1976).

---

[8] These two experts did not go so far as to say that injury to the knee appeared probable to them, but neither did they say that injury was improbable. "[R]elief should not be denied 'simply because science is unable to decisively dissipate the blur between possibility and probability.'" Green v. Al Green Enterprises, Inc., 73 N.J. Super. 132, 138-39, 179 A.2d 151, 155 (1962).

The stringency of this standard is acknowledged by the majority when they say: "If this had been a case where there existed no objective corroboration of claimant's story, then the board's finding of a lack of credibility, coupled with expert medical testimony favoring the employer, would permit the board to conclude that the claim was invalid." Nevertheless, the needed "objective corroboration" (a term which the majority opinion leaves undefined) is found in no more than the likelihood of significant stress on the claimant's knee in the stumble which fractured his toe. This is accepted as corroboration of the *claim* and as rendering of no consequence the fact that portions of the claimant's testimony may have been confused or fabricated. To reach this result the majority states, as an "obvious" medical conclusion, that the stress on the knee aggravated the existing arthritic condition, which event, because it could have contributed to the present condition, must be taken as having been the cause for the purposes of this appeal. But this is a finding which this court cannot make.

There is no medical or other testimony in the record to support the conclusion that the claimant's fall could have produced sufficient stress on his knee, absent any impact of the knee against the floor or stair, to aggravate the arthritic condition. The claimant did not even attempt to support his claim upon any premise other than a violent impact upon the knee. The testimony of the medical experts supported only the possibility, and not the probability, that such an impact could have contributed to the present condition. Whether the same result could have flowed from mere stress, without an impact, is wholly beyond the knowledge of this court. Since the "objective corroboration" upon which the majority relies in rejecting the board's finding is itself but sheer speculation, the majority's own analysis requires that the board's finding be sustained.

Moreover, the record contains other evidence bearing on the credibility of the claimant's testimony which the majority does not mention and which, added to that reviewed in the majority opinion, convinces me that the board's finding

should be sustained. The failure of the claimant to mention to Dr. Shimamura an injury to his knee while he was under treatment for his fractured toe was significant in the board's appraisal of his credibility. The claimant testified that he began to feel pain in his knee about a week after the fall, but since he also testified that he saw Dr. Shimamura only during the first week after the accident, this testimony made it appear that no pain was felt while he was seeing Dr. Shimamura and furnished an explanation of his failure to mention to the doctor any injury to his knee. However, Dr. Shimamura testified that he first examined the claimant on August 31, 1970 and treated him until September 30, 1970, when the strapping was removed from his fractured toe. Thus there was evidence, which the board had no reason to disbelieve, that the claimant omitted any mention of the alleged knee injury while under the doctor's care for about three weeks after the pain allegedly became manifest. When this evidence is added to that which the majority mentions, I have no difficulty in concluding that the record contained substantial evidence in support of the board's rejection of the claimant's testimony.

I am unable to view the board's finding as clearly erroneous on the whole record, and would affirm the order.