34 P.3d 24

**Neal M. TAMASHIRO, Claimant–Appellant,**

v.

**CONTROL SPECIALISTS, INC., and TIG Insurance Company, Employer/Insurance Carrier–Appellee.**

No. 22569.

Intermediate Court of Appeals of Hawai'i.

April 24, 2001.

Certiorari Granted May 30, 2001.

Herbert R. Takahashi, Stanford H. Masui, Danny J. Vasconcellos, Rebecca L. Covert, (Takahashi, Masui & Vasconcellos), Honolulu, on the briefs, for claimant-appellant.

Robin R. Horner, Honolulu, on the brief, for employer/insurance carrier-appellees.

BURNS, C.J., WATANABE, and LIM, JJ.

Opinion of the Court by LIM, J.

Claimant–Appellant Neal M. Tamashiro (Tamashiro) appeals the May 4, 1999 Decision and Order of the Labor and Industrial Relations Appeals Board (the Board). The Decision and Order reversed the Department of Labor and Industrial Relations Director's (the Director) June 19, 1995 decision and order granting Tamashiro temporary total disability benefits for the period from August 5, 1994 to July 15, 1995.

On appeal, Tamashiro contends that the Board erred because it (1) relied upon nonmedical testimony in making its findings of

fact, and (2) thereupon concluded that he was not totally disabled from August 5, 1994 to July 15, 1995. For the following reasons, we affirm the Board's Decision and Order.

## I. BACKGROUND.

On March 30, 1994, Tamashiro, who was employed as a ninth-step apprentice electrician by Control Specialists, Inc. (CSI), injured his right shoulder while he was disconnecting the control wiring for an air handler unit at the Hilton Hawaiian Village. At the time, Tamashiro was standing on a ladder, with his upper body inserted into the tight crawl space above the drop ceiling. According to Tamashiro, he sustained his shoulder injury while reaching and twisting in "[a]wkward kind of positions."

Dr. Darryl Kan (Dr. Kan), Tamashiro's orthopedic surgeon, testified at the Board hearing that Tamashiro most likely tore a shoulder ligament while working in the crawl space. This tear resulted in fluid leaking from the shoulder joint through the tear, causing a ganglion cyst to form on Tamashiro's upper right shoulder blade (i.e., the cyst formed as a result of the leaking fluid, and this tissue-like sac continued to capture and contain fluid leaking through the tear). Tests indicated, and surgery confirmed, that the cyst was situated in the area traversed by the suprascapular nerve, or shoulder blade nerve, thus compressing the nerve and causing its paralysis. Hence, Dr. Kan diagnosed Tamashiro as suffering from a suprascapular nerve palsy.

According to Dr. Kan, the suprascapular nerve controls the shoulder's motor function of external rotation. In relevant part, this nerve controls the range of motion that includes raising the arm to shoulder level and overhead. Dr. Kan testified that the ganglion cyst's compression of the suprascapular nerve caused a weakening of Tamashiro's external rotator muscles.

The pathology of Tamashiro's injury is undisputed. Further, there is no dispute over the fact that he sustained the injury while on the job. Rather, the parties disputed the degree of impairment Tamashiro suffered due to the suprascapular nerve palsy.

For his part, Tamashiro complained of pain whenever he raised his right hand to an overhead position. He contended that the pain made him incapable of working as an electrician. Tamashiro, accordingly, filed a claim for workers' compensation benefits on October 25, 1994.

For their part, the Defendants–Appellees (Appellees), CSI and TIG Insurance Company (the Insurer), contested, *inter alia*, Tamashiro's claim for temporary total disability benefits commencing on August 5, 1994, on the ground that Tamashiro could have performed his usual and customary duties as an electrician for CSI, his injury notwithstanding, but for being laid off on that date.

Appellees based their position, in part, upon several surveillance videos taken by a private investigator hired by the Insurer.

A July 21, 1994 videotape shows Tamashiro working on one of his two power boats for over two-and-one-half hours. During that time, Tamashiro can be seen working on the boat's motor—raising his arms laterally and overhead while using hand tools—for prolonged periods of time. Tamashiro is also shown lunging forward to shut off the motor, bracing himself "primarily with his right hand with his arm extended, placing strain on his shoulder." In addition, the video shows Tamashiro lifting the large motor housing overhead and replacing it onto the motor. Tamashiro took no breaks during these hours of work, exhibited no apparent discomfort or fatigue, and used his arms cooperatively without favoring one over the other.

Another seventy minutes of videotape was taken on June 4, 1995.[1] Tamashiro is again shown working on his boat, exhibiting the full panoply of motion of his right arm while using a series of power tools. In addition, Tamashiro is shown using his right arm to lift two plastic grocery bags—each bag appeared to contain a twelve-pack of twelve-

---

1. The investigator's report mistakenly states that this video was taken on May 4, 1995. However, the correct date of the video is June 4, 1995. This is confirmed by the date displayed on the videotape itself.

ounce, canned beverages—over his head in order to place them into the front seat of his Ford Bronco. The video also captures Tamashiro repeatedly raising his right elbow above his shoulder as he drinks from a plastic bottle, lifting his right hand high enough to empty a dust pan into a dumpster, and showering by raising a hose above his head with his right hand. In essence, the video depicts Tamashiro exhibiting the full range of motion with his right arm in a normal, unrestricted fashion.

Appellees also relied on an independent medical evaluation of Tamashiro, conducted by Dr. John W. Henrickson, Jr. (Dr. Henrickson). On December 9, 1994, Dr. Henrickson, a neurosurgeon, met with Tamashiro at the Insurer's request. Curiously, Dr. Henrickson noted in his report that "[t]he patient indicates he has been a carpenter for six years."

Although Dr. Henrickson diagnosed Tamashiro's condition as a suprascapular nerve entrapment, he nevertheless determined that "[t]his patient is capable of performing work that would allow him to maintain his elbows close to his body and does not involve overhead tasks or moving his shoulder in external rotation." However, on January 16, 1995, Dr. Henrickson reevaluated his impression of the degree of Tamashiro's impairment, after viewing the July 21, 1994 surveillance videotape.

Dr. Henrickson reported that,

I have reviewed the surveillance film on [Tamashiro]. This shows him performing mechanical work on a large Out Board Marine engine. He is observed using mechanical tools (e.g. wrench) with force, working above shoulder levels for long periods of time. It also shows him working overhead in a crouched position, with the same tools, for shorter periods of times [sic]. He also is capable of carrying the cover of the engine overhead and replacing it on the engine. He is also observed using tools with the left hand. There is no indication he has any difficulty whatsoever in using his right upper extremity with force and in above shoulder positions.

The diagnosis remains the same. He has sound clinical evidence of a right supraspinatus nerve entrapment with muscle wasting of the infraspinatus muscle. What is changed is my impression of his upper extremity impairment. He is not functionally impaired to the extent he cannot return to working [sic] as a *carpenter.* He is capable of returning to full duties as a *carpenter* at this time.

(Emphases added.) Further, on January 26, 1995, Dr. Henrickson informed the Insurer that

[Tamashiro] has a surgically correctable lesion of right supraspinatus nerve entrapment.

He has some function impairment because of infraspinatus muscle wasting. This may totally resolve with decompression of the supraspinatus nerve.

He is not functionally impaired sufficiently to preclude him from working as a *carpenter.*

(Emphasis added.)

In contrast, Tamashiro's personal physician, Dr. Jinichi Tokeshi (Dr. Tokeshi), reported on January 12, 1995 [2] that

[s]ubjectively [Tamashiro] complains of pain especially when his right hand is raised in an overhead position. He also experiences pain at night for which he takes Darvocet N–100 and tylenol [sic] with codeine which seem to alleviate some of the pain. Objectively, he has limited range of motion of his right shoulder and tenderness on palpation of the right scapula area. Also obvious is the atrophic suprascapular muscles. Therefore, he is restricted to movement and work that does not require raising his right hand above his shoulders.

Like Dr. Henrickson, Dr. Tokeshi had apparently viewed the July 21, 1994 videotape of Tamashiro working on his boat engine. *See* March 16, 1995 "Interim Report" by Dr. Kan, Record on Appeal, v. 1 at 94 (noting that, "I have spoken with Dr. Tokeshi who states he also viewed the videotape."). However, unlike Dr. Henrickson, Dr. Tokeshi—according to Dr. Kan—"was not as convinced

---

**2.** Dr. Jinichi Tokeshi's report is dated, January 12, 1994. However, the correct date is January 12, *1995.*

that [Tamashiro] was exhibiting strenuous force above shoulder level during the course of the tape." *Id.*

On July 29, 1994, after viewing the videotape, Dr. Tokeshi had released Tamashiro for work, limited by the prohibition against overhead activities with his right arm. Still later, on November 15, 1994, Dr. Tokeshi had certified that Tamashiro had been incapacitated by the nerve palsy since August 4, 1994. Following up, Dr. Tokeshi's March 30, 1995 WC–2 Report stated that his "re-examine [sic] finds patient cannot even hold up magazine when lying down [secondary] to pain." Dr. Tokeshi thereupon continued his prescription of Tylenol #3 and Darvocet for treatment of Tamashiro's purported pain.

By decision and order dated June 19, 1995, the Director awarded Tamashiro, in pertinent part, temporary total disability benefits from "August 4, 1994 and terminating at such time as is determined by the Director that such disability has ended." In reaching her decision, the Director credited Dr. Tokeshi's January 12, 1995 report and only that part of Dr. Henrickson's December 9, 1994 evaluation in which he diagnosed Tamashiro's condition, prohibited any overhead work, and stated that he was not stable and rateable at that time. The Director apparently did not view the July 21, 1994 or June 4, 1995 video tapes.[3]

On July 3, 1995, Appellees appealed the Director's decision and order. On August 9, 1995, after a conference attended by lawyers from both sides, the Board issued a Pretrial Order identifying the sole issue before the Board—whether Tamashiro was totally disabled from August 5, 1994 up to the date of his corrective surgery, July 15, 1995.

The hearing before the Board commenced on March 5, 1997 and was completed on June 17, 1997. Tamashiro, of course, continued to assert that his injury rendered him incapable of performing as an electrician. He relied, in great part, on the opinions of Dr. Tokeshi

and Dr. Kan. Both doctors had opined that Tamashiro was temporarily totally disabled.

Dr. Tokeshi based his opinion upon his observation that Tamashiro could not do any overhead activities with his right arm without complaining of debilitating pain. He therefore restricted Tamashiro "to movement and work that does not require raising his right hand above his shoulders."

Dr. Kan's restrictions were, however, far less severe. In his February 15, 1996 report, he recommended limiting Tamashiro to "light-duty," or "no lifting greater than 15 lbs overhead occasionally." His opinion that Tamashiro was temporarily totally disabled was based primarily upon Tamashiro's claim that the job required overhead lifting of loads greater than fifteen pounds. At the Board hearing, Dr. Kan testified that Tamashiro could lift more than twenty pounds on an occasional basis, and that he could do overhead work on an "infrequent" basis, or for less than four hours per day.

Tamashiro testified before the Board. In his testimony, Tamashiro stated that his job required overhead lifting of loads heavier than fifteen to twenty pounds. Specifically, he recalled carrying and lifting a fifty-pound tank filled with carbon dioxide up a ladder to perform work in drop ceilings.[4] Tamashiro did admit under cross-examination, however, that he was able to reach overhead, albeit "with pain and aggravation."

In their appeal of the Director's decision and order, Appellees contended that "[Tamashiro] was able to resume work between August 5, 1994 and July 15, 1995 and therefore, he is not entitled to receive temporary disability benefits." In support of this contention, Appellees submitted three videotapes, including the videotapes of Tamashiro's activities on July 21, 1994 and June 4, 1995, described above.

The third videotape ran for over three hours, and showed Tamashiro doing what appeared to be electrical work on a friend's

---

3. Instead of submitting the actual videotapes to the Director, the TIG Insurance Company representative submitted eleven photographs made from the videotape of Tamashiro's July 21, 1994 activities.

4. Tamashiro's testimony implicitly conceded that the carbon dioxide tank had a lengthy hose, but he claimed that the hose was not long enough to reach the ceiling from the floor.

house. This videotape was taken on July 8, 1995, one week before Tamashiro's corrective surgery. In the July 8, 1995 videotape, Tamashiro demonstrated a full range of motion with his right arm as he carried a nine-foot-plus metal ladder, repeatedly shoved the meter cover into place, handled electrical cable over his head while standing on a ladder, and pushed, pulled and basically strong-armed electrical cable at and above shoulder level. While it is evident that these activities required considerable exertion on Tamashiro's part, he performed them, using his right arm, with no apparent strain or extraordinary effort for over three hours.

Appellees also submitted expert opinions confirming that the work Tamashiro is seen performing on videotape was electrical work; indeed, electrical work that required greater physical exertion than that inherent in the work performed by CSI.

Bryan Hefner (Hefner), the responsible managing employee for Johnson Controls in Hawai'i, viewed the July 8, 1995 videotape and concluded that Tamashiro was "obvious[ly] . . . doing electrical work by changing the electrical service of a residence."

This opinion was shared by Ricky Almodova (Almodova), the program specialist in charge of apprenticeships for the Hawai'i Electricians' Training Fund. After viewing the tape, Almodova observed that "[t]he type of work performed by [Tamashiro] is typical of a qualified electrician."

Further, CSI president Dennis King (King) testified before the Board that the electrical work Tamashiro performed on July 8, 1995 was not "typical" of the work performed by CSI. King testified that where Tamashiro was caught on videotape "changing the main meter feed," he was doing "power wiring," which requires greater physical strength and exertion than the kind of work performed by CSI. King explained that the cable Tamashiro was working with

> is two conductors made out of aluminum wrapped with a bare aluminum that they use for the neutral wire covered by an

outer shielding. It doesn't bend very well. It's very stiff. It's hard to work with.

King further stated that

> [the cable is] hard to manage and it does not want to bend the way you want it to bend.
>
> And that's why if you noticed, there was a couple things that he was fighting that when he was trying to put it in the meter socket.

King also testified that CSI had never bought for its jobs the thickness of cable Tamashiro is seen working with in the July 8, 1995 videotape.

King's testimony was supported by the testimony of CSI supervisor, Clee Woolsey (Woolsey), and by the testimony and job analyses conducted by Florian Flores (Flores), a physical therapist with CHART, a rehabilitation services provider.

At the Board hearing, Woolsey testified that CSI specializes in "control wiring," which includes wiring for air conditioning controls, low voltage controls, and control panel relays. According to Woolsey:

> It's actually with my experience [that control wiring] is one of the lightest of all. If you work as an underground electrician or a regular power or *house wiring* [sic], it's one of the lightest work in [sic] electrical field.

(Emphasis added.)

Flores was the only expert witness who had viewed the videotapes of July 21, 1994, June 4, 1995, and July 8, 1995, who had visited two of CSI's job sites in order to evaluate the job duties of a CSI electrician, and who was familiar with the pathology of Tamashiro's injury. Flores observed that

> [i]n all of the tapes . . . there were no shoulder or arm movements indicating right shoulder discomfort such as shoulder shrugging, or ipsilateral neck side-bending with simultaneous shoulder shrugging. In walking, as well, arm swing was symmetrical and smooth.

In addition, Flores found that though overhead lifting on the CSI jobs occurred frequently, the heaviest load was no more than 10 pounds—a weight he determined Tamashiro was capable of handling overhead, giv-

en his review of the videotapes. Finally, Flores found it necessary to revise his initial job analysis by increasing the frequency of lifting and carrying of thirty-five to fifty pound loads from "never" to "infrequent". He noted, however, that this revision did not alter the nature of the *overhead* activities Tamashiro would be required to perform for CSI, and therefore did not alter his conclusion that Tamashiro could have performed his usual and customary job duties for CSI from August 5, 1994 to July 15, 1995.

On May 4, 1999, the Board issued its Decision and Order reversing the Director's June 19, 1995 decision. In reaching its decision, the Board found, in pertinent part:

*Medical opinions regarding [Tamashiro's] ability to work*

29. In his December 9, 1994 report, Dr. Henrickson opined that [Tamashiro] was capable of performing work that would allow him to maintain his elbows close to his body and did not involve overhead tasks or moving his shoulder in external rotation. The report referred to [Tamashiro] as a carpenter.

Subsequently, Dr. Henrickson reviewed the video of [Tamashiro] working on the outboard motor on July 21, 1994. In a letter dated January 16, 1995, Dr. Henrickson stated that there was no indication that [Tamashiro] had any difficulty in using his right upper extremity with force and in above shoulder positions. Dr. Henrickson also stated that [Tamashiro] was not functionally impaired to the extent that he could not return to work as a carpenter and that he was capable of performing his full duties, but we are unable to accept that opinion, because Dr. Henrickson mistakenly identified [Tamashiro's] job as that of a carpenter. We consider, however, Dr. Henrickson's opinion in his December 1994 report about the type of work [Tamashiro] could perform as well as his assessment of [Tamashiro's] videotaped activities, to be valid.

In a report dated March 19, 1996, Dr. Tokeshi stated that since the work injury, [Tamashiro] was totally disabled from the type of work that involved raising his right arm above his head. It is undisputed that before his injury, [Tamashiro] performed overhead work for [CSI].

In a report dated February 15, 1996, Dr. Kan opined that [Tamashiro] was temporarily and totally disabled for work from August 5, 1994 up to July 15, 1995. Dr. Kan would have placed [Tamashiro] on light-duty status with no lifting greater than 15 lbs. overhead occasionally. Dr. Kan believed that [Tamashiro's] job required a greater degree of lifting and that [Tamashiro] would have had difficulty performing strenuous labor at overhead levels, as his objective motor strength was a full grade below normal due to the nerve compression. Dr. Kan was also concerned that [Tamashiro] would have been exposed to further muscle damage if he performed overhead lifting greater than 15–20 lbs. from August 5, 1994 up to July 15, 1995.

At trial, Dr. Kan explained that he had discussed [Tamashiro's] work duties with Dr. Tokeshi, who informed Dr. Kan that [Tamashiro's] level of work duty involved moderate to heavy lifting (lifting above 50 lbs. occasionally and overhead lifting of 30–35 lbs. occasionally). Dr. Kan had felt that [Tamashiro] would be unable to return to moderate to heavy duty, but that [Tamashiro] could handle light duty with overhead lifting of 15 lbs. occasionally. Dr. Kan's concern was that if [Tamashiro] performed repetitive overhead work, he could suffer irreversible damage to his right shoulder.

30. While Dr. Tokeshi and Dr. Kan opined that [Tamashiro] was totally disabled for work for the disputed period, the basis for their opinions is different. Dr. Tokeshi restricted [Tamashiro] from raising his right arm above his head. Dr. Kan believed that [Tamashiro's] regular work would have required him to do repetitive overhead lifting exceeding 15–20 lbs.

31. Because of the lack of consensus in the medical opinions, we consider the nonmedical [sic] opinions to be of great probative value in determining [Tamashiro's] ability to work.

*Non-medical [sic] opinions regarding [Tamashiro's] ability to work*

32. In his March 16, 1996 report, [Flores] analyzed [Tamashiro's] pre-operative right shoulder function based on the surveillance videos taken during the period before the surgery, including the July 21, 1994 and July 8, 1995 videos.

[Flores] noted that [Tamashiro] frequently positioned his right arm overhead, used overhead pronation/supination movements, exerted apparent moderate force with the shoulder above 90° in a position of flexion/abduction, that [Tamashiro] performed these movements without any slow, guarded behavior and that his right shoulder function appeared to be undisturbed.

In his job analysis, [Flores] found that there was no overhead lifting greater than 10 lbs. [Flores] concluded that given [Tamashiro's] functional abilities as demonstrated on video and the physical requirements of his job, [Tamashiro] could perform all usual and customary duties of his job as an electrician, 9th step apprentice with [CSI].

Based on additional information, [Flores] prepared an updated job analysis, which is attached to his February 24, 1997 report. [Flores] stated that the additional information did not change the nature of [Tamashiro's] overhead activities so as to potentially limit him in performing his job and that [Tamashiro] still would have been able to perform his usual and customary occupation before July 15, 1995.

33. [King] testified that the work [Tamashiro] was observed performing at his friend's house in Aiea involved power wiring, which is heavier work than the work done at his company. [CSI] is primarily involved in control wiring, in contrast to power wiring, and installs controls for air conditioning systems.

34. By sworn letter dated August 7, 1995 [Hefner], the responsible managing employee for Johnson Controls, reported that he had reviewed the video of July 8, 1995 and that [Tamashiro] was doing electrical work by changing the electrical service of a residence and that [Tamashiro] was pulling, feeding, and splicing cables to the meter. [Hefner] has 23 years of experience in the construction industry.

35. By letter dated August 8, 1995, [Almodova], program specialist for the Joint Apprenticeship Committee for the Electrical Industry, who is in charge of apprenticeship at the Hawai'i Electricians Fund and whose responsibilities include safety and journeyworker upgrading, reported that he had reviewed the video of July 8, 1995 and that [Tamashiro] was performing outside electrical work at a residence, that he was pulling, feeding, and terminating the service cable, that he appeared to be actively engaged in altering the electrical service/meter to the residence, and that the type of work performed by [Tamashiro] was typical of the work of an electrician.

36. In his testimony, [Tamashiro] has indicated that he was unable to perform work as an electrician. [Tamashiro] also testified about the nature of his overhead work activities and stated that he had to carry a $CO_2$ tank weighing 50 lbs. up a ladder and then use it overhead to shoot compressed air through pipes. Regarding his activities on July 8, 1995, [Tamashiro] stated that he was only assisting his friend to mount a panel box and install a meter main and that his friend did most of the work.

In view of the surveillance videos and other evidence in the record, we find that [Tamashiro's] testimony regarding his ability to return to work as an electrician, his overhead work activities, and the characterization of his activities at his friend's house on July 8, 1995, is lacking in credibility and we do not accept his testimony on those matters.

*[Tamashiro's] ability to work*

37. Based on [King's] testimony and the statements of [Hefner] and [Almodova], we find that the work [Tamashiro] performed at the Aiea house on July 8, 1995, was work typically performed by an electrician and was heavier in nature than his regular work with [CSI].

38. Based on [Flores'] opinion, which [Tamashiro] attempted to refute by his testimony, we find that [Tamashiro's] usual and customary work with [CSI] did not

require repetitive overhead lifting exceeding 15–20 lbs.

39. Because Dr. Kan is an orthopedic surgeon, we give his opinion greater weight than the other medical opinions. We find, however, that even under Dr. Kan's opinion, [Tamashiro] would not be entitled to temporary total disability. Dr. Kan would have released [Tamashiro] to light duty, because Dr. Kan felt that [Tamashiro's] regular work with [CSI] was more strenuous than it actually was in that it would have required repetitive overhead lifting greater than 15–20 lbs.

40. We find that [Tamashiro] was able to resume work from August 5, 1994 up to July 15, 1995.

(Footnote omitted.) The Board thereupon concluded that

[Tamashiro] was not temporarily and totally disabled for work from August 5, 1994 and prior to the date of surgery, July 15, 1995, as a result of his work injury of March 30, 1994, because he was able to resume work in his usual and customary employment as an electrician.

## II. ISSUE PRESENTED.

The overarching issue in this appeal is whether Appellees adduced substantial evidence in their appeal before the Board to overcome the presumption, under Hawaii Revised Statutes (HRS) § 386–85 (1993),[5] that Tamashiro was totally disabled from August 5, 1994 up to July 15, 1995. *Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 650–51, 636 P.2d 721, 727 (1981) ("HRS § 386–85 clearly dictates that coverage will be presumed at the outset, subject to being rebutted by substantial evidence to the contrary. This is so in *all* claims proceedings[.]" (Emphasis added.)) *See also Korsak v. Hawai'i Permanente Medical Group, Inc.*, 94 Hawai'i 297, 306, 12 P.3d 1238, 1247 (2000) ("we construe the use of the word 'any' [in HRS § 386–85]

5. Hawaii Revised Statutes (HRS) § 386–85 (1993) provides:

**Presumptions.** In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary:

(1) That the claim is for a covered work injury;

to mean that the presumption applies in all proceedings conducted pursuant to the workers' compensation chapter" (citation omitted)). We conclude that Appellees adduced the substantial evidence necessary to rebut the statutory presumption.

## III. STANDARD OF REVIEW.

■■ HRS § 91–14(g) (1993) governs our review of the Decision and Order of the Board. *Id.* at 302, 12 P.3d at 1243. This statute provides:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g). Hence, conclusions of law (CsOL) are reviewed under subsections (1), (2) and (4), and findings of fact (FsOF) are reviewed under subsection (5). *Korsak*, 94 Hawai'i at 302, 12 P.3d at 1243. Accordingly,

[a]ppeals taken from [FsOF] set forth in decisions of the [Board] are reviewed under the clearly erroneous standard. Thus, the court considers whether such a finding

(2) That sufficient notice of such injury has been given;

(3) That the injury was not caused by the intoxication of the injured employee; and

(4) That the injury was not caused by the wilful intention of the injured employee to injure oneself or another.

is [c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.] The clearly erroneous standard requires the court to sustain the [Board's] findings unless the court is left with a firm and definite conviction that a mistake has been made.

A [COL] ... is not binding on an appellate court and is freely reviewable for its correctness. Thus, the court reviews [CsOL] de novo, under the right/wrong standard.

*Id.* at 302–03, 12 P.3d at 1243–44 (citations and internal block quote format omitted, some brackets in the original).

## IV. DISCUSSION.

■ Because Tamashiro claimed workers' compensation benefits pursuant to HRS § 386–31(b) (1993),[6] the presumption imposed by HRS § 386–85 applies. *Korsak,* 94 Hawai'i at 306, 12 P.3d at 1247 ("we construe the use of the word 'any' [in HRS § 386–85] to mean that the presumption applies in all proceedings conducted pursuant to the workers' compensation chapter" (citation omitted)). Hence, the issue is whether the presumption was rebutted by substantial evidence. *Chung,* 63 Haw. at 650–51, 636 P.2d at 727; *Freitas v. Pacific Contractors Company,* 1 Haw.App. 77, 85, 613 P.2d 927, 933 (1980). In *Akamine v. Haw'n Packing & Crating Co.,* 53 Haw. 406, 408, 495 P.2d 1164, 1166 (1972), the supreme court defined substantial evidence as "relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable man that an injury or death is not work-connected." (Citations omitted.)

In this case, then, we may affirm the Board's conclusion that Tamashiro was not temporarily totally disabled if it was supported by substantial evidence demonstrating that he was able, despite his March 30, 1994 work injury, to perform the usual and customary duties of an electrician for CSI during the time period in question.

In its findings of fact, the Board found a lack of consensus amongst the three physicians regarding the degree of Tamashiro's impairment. It therefore placed "great probative value" on the nonmedical evidence adduced by Appellees. The Board's findings of fact indicate that such nonmedical evidence, combined with the opinion of Tamashiro's orthopedic surgeon, Dr. Kan, comprised in its view the requisite substantial evidence. Upon review of the record, we agree.

Appellees undoubtedly produced a substantial quantum of evidence. Although the Board was unable to accept the opinion of Appellees' medical expert (Dr. Henrickson) that Tamashiro "was not functionally impaired to the extent that he could return to work as a carpenter," the Board had ample nonmedical evidence upon which to base its findings. Such evidence included the surveillance videos, expert opinions regarding the nature of Tamashiro's videotaped activities, testimony regarding the rigor of the electrical work typically performed by CSI, expert analysis of the nature and requirements of the job, and expert opinion regarding Tamashiro's ability to perform the job.

Furthermore, the record reveals that the Board was amply supported in its finding that the nonmedical evidence offered by Appellees was credible and relevant. The Board was therefore entitled to accord it "great probative value[.]" *See Akamine,* 53 Haw. at 410, 495 P.2d at 1167 (stating the converse of this proposition: "certain portions of the testimony of the two expert witnesses ... were irrelevant or entitled to very little probative weight"). First, the surveillance videos presented objective evidence showing that Tamashiro was capable of executing a full range of vigorous motion with his right arm and shoulder, over prolonged periods of time, without experiencing apparent pain or fatigue. The videos also provided Appellee's nonmedical experts with relevant objective data upon which to base their opinions. As a result, the opinions of Appellee's nonmedical experts were clearly relevant and

6. HRS § 386–31(b) (1993) provides, in pertinent part, that

[w]here a work injury causes total disability not determined to be permanent in character, the employer, for the duration of the disability, but not including the first three calendar days thereof, shall pay the injured employee a weekly benefit at the rate of sixty-six and two-thirds per cent of the employee's average weekly wages[.]

creditable. The Board therefore properly attached great probative weight to the opinions of Appellee's nonmedical experts. *See Akamine*, 53 Haw. at 409, 495 P.2d at 1167 ("[t]o be substantial, the evidence, as a minimum requirement, must be credible and relevant").

Hefner and Almodova, with a combined forty-seven years of construction and electrical industry experience between them, viewed the July 8, 1995 videotape before opining that Tamashiro was there engaged in typical electrician's work. Flores was a physical therapist for twenty-two years, who specialized in functional medical, extremity, placement and job evaluations. Because of this background, Flores was uniquely positioned to analyze the comprehensive database for his opinions, that included Tamashiro's medical records, two CSI job site visits and a resulting job description, and the videotapes. Flores thereupon concluded that the CSI job entailed overhead lifting of loads no heavier than ten pounds and that Tamashiro, notwithstanding his injury and given his videotaped activities, was capable of such activities.

The Board also relied on the uncontested fact that CSI was primarily engaged in control wiring. Despite Tamashiro's anecdotal testimony to the contrary, the Board accepted the contention of CSI president King that control wiring requires less strength and physical exertion than the power wiring Tamashiro is seen doing in the July 8, 1995 videotape.

 Thus, in its findings, the Board gave no credit to Tamashiro's testimony:

In view of the surveillance videos and other evidence in the record, we find that Claimant's testimony regarding his ability to return to work as an electrician, his overhead work activities, and the characterization of his activities at his friend's house on July 8, 1995, is lacking in credibility and we do not accept his testimony on those matters.

Where, as here, the weight and credibility of the testimony is at issue, we

decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field.

*In re Gray Line Hawai'i Ltd.*, 93 Hawai'i 45, 53, 995 P.2d 776, 784 (2000) (citations and internal block quote format omitted). *Cf. Bank of Hawaii v. Kunimoto*, 91 Hawai'i 372, 390–91, 984 P.2d 1198, 1216–17 (1999) ("[g]enerally, the credibility of witnesses and the weight to be given their testimony are within the province of the trial court and, generally, will not be disturbed on appeal" (citations omitted)).

In light of the foregoing, the Board was also warranted in its determination that, notwithstanding the conflicting medical opinions, Dr. Kan's opinion as Tamashiro's orthopedic surgeon was due greater weight. *See Gray Line Hawai'i*, 93 Hawai'i at 53, 995 P.2d at 784. Under cross-examination, Dr. Kan agreed that Tamashiro would have been able to work where the job entailed lifting loads no heavier than ten pounds for no more than four hours a workday—as was the case with the CSI job. Hence, Dr. Kan would have released Tamashiro for "light duty," thereby altering his opinion that Tamashiro was temporarily totally disabled.

In this case, as demonstrated above, the net weight of the evidence before the Board amounted to substantial evidence. Therefore, we conclude that the Board's findings of fact are not clearly erroneous, given that substantial evidence is contained in the record.

However, before we can affirm the Board's decision, *Akamine* requires that we take our analysis one step further, in order to determine whether any *reasonable* doubt exists regarding the question of compensability.[7]

---

7. *Akamine v. Haw'n Packing & Crating Co.*, 53 Haw. 406, 495 P.2d 1164 (1972), and the long line of cases following it, have firmly established the principle that "if there is *reasonable* doubt as to whether an injury is work-connected, the humanitarian nature of [the workers' compensation law] demands that doubt be resolved in favor of the claimant." *Id.* at 409, 495 P.2d at 1166

*Akamine,* 53 Haw. at 409, 495 P.2d at 1166. *See also DeFries v. Association of Owners,* 57 Haw. 296, 305–06, 555 P.2d 855, 861 (1976) (observing that *"Akamine* also requires (1) that the evidence be substantial in 'net weight' . . . and (2) that in the ascertainment of net weight all reasonable doubts are to be resolved in favor of the claimant" (footnote and internal citation omitted)).

Although he does not expressly identify the existence of reasonable doubt as an issue on appeal, Tamashiro raises the issue when he argues (1) that the Board relied on an erroneous job description, and (2) that the Board erroneously refused to apply Dr. Tokeshi's opinion that he was temporarily totally disabled. While we agree that these arguments may raise a doubt as to the Board's findings, that doubt is hardly reasonable.

█ A reasonable doubt would undisputably exist had the Board relied on a job description that inaccurately delimited the overhead lifting requirements of Tamashiro's job. In its findings, the Board expressly relied on Flores's job analysis that set the overhead lifting requirement at no more than ten pounds. Tamashiro challenged this delimitation with his anecdotal testimony that the job required frequent, overhead lifting of a fifty-pound, carbon dioxide tank. Here, the Board was required to pass upon the credibility of two witnesses who offered conflicting testimony.

As discussed above, the Board found that Tamashiro's testimony lacked credibility in, among other things, the matter of his overhead work activities. As also discussed above, we "decline to . . . review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field." *Gray Line Hawai'i,* 93 Hawai'i at 53, 995 P.2d at 784. Hence, we conclude that the Board was war-

ranted in its reliance upon Flores's testimony. We therefore discern no reasonable doubt as to the overhead lifting parameters of Tamashiro's job.

█ Of course, the Board's finding that the job's overhead lifting requirement was limited to loads no heavier than ten pounds must necessarily be coupled with the finding that Tamashiro could lift his right arm overhead without debilitating pain. Thus, we must also reckon with the question of doubt raised by the opinion of Tamashiro's personal physician, Dr. Tokeshi, that Tamashiro was incapable of doing work that involved raising his right arm overhead.

The reasonableness of this doubt is, however, suspect. Dr. Tokeshi provided the only medical opinion corroborating Tamashiro's claim that all overhead movement caused him pain. This corroboration was nevertheless based upon purely subjective information—Tamashiro's self-reported pain. Dr. Tokeshi, in fact, reported that *"[s]ubjectively* [Tamashiro] complains of pain especially when his right hand is raised in an overhead position." (Emphasis added.)

Objective evidence, on the other hand, demonstrates that Tamashiro exaggerated his sense of pain when reporting to Dr. Tokeshi. Simply put, he was caught red-handed in the videotapes. The videotapes depict him executing the full range of movement with his right arm, including prolonged periods of overhead activities involving both gross and fine motor skills. Moreover, the videos show that Tamashiro was capable of lifting and manipulating weights well in excess of ten pounds over his head. Tamashiro exhibited no outward signs of discomfort, fatigue or pain during the activities captured on video.

Hence, there exists no objective corroboration of Tamashiro's claim that he experienced disabling pain whenever he raised his right arm overhead. This fact, along with the

---

(emphasis added). However, *Korsak v. Hawaii Permanente Medical Group, Inc.,* 94 Hawai'i 297, 12 P.3d 1238 (2000), states that "under our workers' compensation statute, *any 'doubts* [must] be resolved in favor of the claimant.' " *Id.* at 308, 12 P.3d at 1249 (citing *Akamine,* 53 Haw. at 409, 495 P.2d at 1166) (emphasis added, brackets in the original, other citation omitted).

Because *Korsak* cites as its authority the *Akamine* passage that qualifies the word "doubt" with the word "reasonable," we conclude that the omission of the qualifier was an oversight. Hence, where the doubt is "reasonable," it will be resolved in favor of the claimant.

Board's finding that Tamashiro's testimony lacked credibility, and the abundance of both medical and nonmedical testimony favoring the Appellees, belies the reasonableness of any doubt Dr. Tokeshi's opinion may raise. *Cf. DeFries*, 57 Haw. at 308, 555 P.2d at 862 (observing that "[i]f this had been a case where there existed no objective corroboration of claimant's story, then the board's finding of a lack of credibility, coupled with expert medical testimony favoring the employer, would permit the board to conclude that the claim was invalid").

We recognize that "[t]he legislature indeed has cast a heavy burden on the employer in workmen's compensation cases." *Akamine*, 53 Haw. at 409, 495 P.2d at 1166. We also recognize that this burden is surmountable, as this case demonstrates. The record contains the substantial evidence required to support the Board's conclusion that Tamashiro could perform his usual and customary job duties, and that he was therefore not temporarily totally disabled. Furthermore, no reasonable doubt exists as to this conclusion.

## V. CONCLUSION.

Based on the foregoing, we affirm the Board's May 4, 1999 Decision and Order.