67 P.3d 792

Cathleen W. MIYAMOTO,
Claimant–Appellant,

v.

WAHIAWA GENERAL·HOSPITAL,
Employer–Appellee,

and

Reliance Insurance Company, adjusted by
Adjusting Services of Hawai'i, Inc.,
Insurance Carrier–Appellee.

No. 22930.

Intermediate Court of Appeals of Hawai'i.

March 27, 2003.

Certiorari Denied May 2, 2003.

Kevin P.H. Sumida (Matsui Chung Sumida & Tsuchiyama, of counsel), Honolulu, for claimant-appellant.

Robert C. Kessner, Beverly S.K. Tom, and Cori Ann C. Takamiya (Kessner Duca Umebayashi Bain & Matsunaga, of counsel), Honolulu, for employer/insurance carrier-appellees.

BURNS, C.J., WATANABE, and LIM, JJ.

Opinion of the Court by WATANABE, J.

This appeal arises out of a denial of a claim by Claimant–Appellant Cathleen W. Miyamoto (Claimant) for workers' compensation benefits for injuries she suffered as a result of an unwitnessed fall onto a level floor at work. In affirming the denial, the Hawai'i Labor and Industrial Relations Appeals Board (LIRAB) found, based on the medical evidence, that (1) Claimant's fall was "idiopathic[,]" i.e., one "brought on by a purely personal condition unrelated to employment"; and (2) "Claimant did not present reliable or credible evidence to show that she did not sustain an idiopathic fall, or that job factors increased the risk or hazard of her fall." LIRAB, therefore, concluded that Claimant's injuries were not compensable.

We reverse LIRAB's October 19, 1999 Decision and Order that, in turn, affirmed the November 18, 1996 decision of the Director of Labor and Industrial Relations (the Labor Director) denying Claimant's claim for workers' compensation benefits, and remand for further proceedings consistent with this opinion.

## BACKGROUND

### A. The February 21, 1996 Incident

On February 21, 1996, Claimant, then thirty-nine years old, was employed as a medical office clerk at Wahiawa General Hospital's (Employer) outpatient clinic. Her duties involved answering the telephone, photocopying documents, filing, and checking patients into the clinic. At about 11:30 a.m. that day, Claimant was allegedly photocopying documents when she suddenly fell backwards and hit the base of her skull on a lightly carpeted level concrete floor. Two of Claimant's coworkers, hearing a loud noise, turned around and observed Claimant lying unresponsively on her back on the floor, her eyes "fluttering" and "rolling back[,]" her "arms flexed upward and inward (decorticate posturing [1])," and her left ear bleeding.

Allan B. Chun, D.O. (Dr. Chun), who was immediately summoned to the scene, reported that upon his arrival less than thirty seconds later, Claimant was "unresponsive, trying to move, [and] groaning unintelligibly." Dr. Chun also stated that Claimant had a "contusion/large hematoma" on her left occiput, i.e., the back of her head, and her eyes were "sluggishly reactive." Claimant was medevaced to The Queen's Medical Center, where she was diagnosed as having a basal skull fracture, a ruptured left ear drum, and various contusions.

It is undisputed that no one witnessed Claimant fall and that Claimant has no recollection of how or why she fell. Claimant's medical records reveal that Claimant had an extensive medical history, had been taking numerous prescribed medications for years, and had last taken, the night before she fell, some medication (prescribed, as well as over-the-counter medication for a cold). Medical records also indicate that Claimant had never fainted, experienced episodes of dizziness or vertigo, or suffered any seizures prior to the incident in question. Following the incident, however, Claimant suffered two additional seizure episodes and, as a result, has been diagnosed with a seizure disorder, for which she now takes medication.

### B. The Claim for Workers' Compensation Benefits

On or about June 7, 1996, Claimant filed a claim for workers' compensation benefits with the Labor Director. Pursuant to a written decision dated November 18, 1996, the Labor Director denied Claimant's claim. On December 3, 1996, Claimant filed an appeal to LIRAB. Claimant and Employer thereafter agreed to submit the appeal to LIRAB on the briefs.

### C. The Record Before LIRAB

The record before LIRAB included the reports or deposition testimony of several doctors who examined Claimant following the

1. In "decorticate posturing[,]" the upper arms are drawn into the side of the body. The forearms are drawn in against the chest with the hands generally at right angles to the forearms, pointing towards the waist. The legs are drawn up against the body, knees are up, feet are in near the buttocks and extended in a ballet-type pose." The Sloane–Dorland Annotated Medical–Legal Dictionary 185 (1987).

February 21, 1996 incident. None of these doctors were able to determine with any reasonable degree of probability what caused Claimant to fall.

Dr. James F. Pierce (Dr. Pierce), a neurologist, wrote in a letter dated July 26, 1996, as follows:

[Claimant] continues to be concerned as to why she blacked out at work, and I very carefully reviewed her records in an effort to identify anything that might predispose her to that. I was unable to identify any definite factors prior to the date of the accident[ ] that would point to a probable cause for her loss of consciousness.

. . . .

I received a letter from the law firm of Kessner, Duca, Umebayashi, Bain and Matsunaga, and their specific questions therein. Referring to page 5 of that letter:

. . . .

3. There is no way to make a firm statement within a reasonable medical probability as to what caused her initial fall. I think she does suffer from a seizure disorder.

4. There is no way of knowing if [Claimant] had a seizure problem which caused her fall, or if the fall itself with consequent brain injury caused her first seizure. Another scenario would be that she had [a] syncopal episode,[2] and when she hit the floor with her head, as a result of the trauma she had her first seizure. *There is no way now, or will there ever be, a way of knowing exactly what happened.*

. . . .

7. I do not think that this occurrence was related to medications. I do not think the Deconamine caused her problem unless she had been taking it for some time and suddenly stopped taking it. Indications from communications that I have is that she indeed was taking it or did take it the night before, so withdrawal would not be a factor.

Finally, there are many difficult issues in this situation. *The most difficult one is what caused her to fall and there is simply no answer for this.* I do not think the first episode was only syncope,[3] though that could have been the initial event. I think she had a seizure, though it was not apparently recognized as that by medical personnel at the time. *I do not know of any job factors that would have caused her to black out. I wish I could answer for her why she had this episode, but I do not have the ability to define that from the data available.*

. . . .

I wish I could further resolve issues that I know will be outstanding and likely debated for some time, but *there simply are no absolute explanations for all of the events which transpired.*

(Emphases and footnotes added.)

Dr. Jordan S. Popper (Dr. Popper), a neurologist who performed a consultative examination of Claimant, was deposed on October 11, 1996 and asked what he believed caused Claimant to fall on February 21, 1996. The following colloquy between Dr. Popper and Employer's attorney transpired:

Q What are the medical causes of a person falling suddenly such as [Claimant] did on February 21, 1996? What possible medical causes can there be?

A **She could have tripped and fallen.**

Q Do you have anything to indicate that's the case?

A **I don't have anything to indicate either way.**

Q Do you know if it was level ground or if there were steps?

A **My understanding was even from [Claimant] that it was level and she shouldn't have fallen, but the fact is she doesn't remember what happened.**

2. According to *The Sloane–Dorland Annotated Medical–Legal Dictionary* at 686, the term "syncopal episodes" refers to "temporary loss of consciousness."

3. "Syncope" is defined as "a temporary suspension of consciousness due to generalized cerebral ischemia; a faint or swoon." *The Sloane–Dorland Annotated Medical–Legal Dictionary* at 686. "Ischemia" is a "deficiency of blood in a part, due to functional constriction or actual obstruction of a blood vessel." *Id.* at 389.

Something could have been in her way that she didn't know about.

The other possibility is a fainting spell which can cause falling, and the third possibility is a seizure. And, certainly, any one of those could have done it.

Q  Given that you now believe she has a seizure disorder based upon subsequent seizures, and you said it takes two or more, what is the more reasonable explanation of her fall on 2–21–96 of the three factors that you enumerated?

. . . .

[A]  I don't think that the development of the seizures until later indicates that she had a seizure to cause it.

. . . .

Q  But is the fall consistent with a seizure?

A  It's consistent with, but it doesn't exclude the other possibilities.

Q  Now that we know that she has a seizure disorder, as you've diagnosed, does that render it more likely that the reason she fell on 2–21–96 was the initial seizure?

A  No. Because she had the kind of injury that causes posttraumatic seizure disorders. And I don't find any indication—and I really looked carefully at all the records. I see no indication that she ever had anything suggestive of a seizure before, and she was under the kinds of stresses in the past that would lead to the development of the seizure.

Q  A seizure disorder can be secondary to trauma, I take it?

A  That's right.

Q  Can there be seizure disorders that are not secondary to trauma?

A  Yes.

Q  Are you able to differentiate in her case within reasonable medical probability?

A  I would have to say that putting together her past history in which she was exposed to the type of situations that patients with seizure disorders cannot undergo without having seizures—drug addiction, drug withdrawal, detoxification, usage of high dosage medication of multiple types, suicide gestures, a significant anemia from bleeding, bleeding tendencies abdominally from some of her procedures and post-op procedures—all of these would tend to produce seizures in a patient with a seizure disorder. So absenting any seizure response in the past with a normal EEG in the past—

Q  Do you know if there was an EEG taken?

A  Yes.

Q  Was it normal?

A  It was normal.

Q  As of what point in time?

A  It was 1985, I believe.

. . . .

. . . [W]ith a normal EEG in the past with no seizure activity at any time despite the kinds of circumstances and stresses that we would expect to produce a seizure disorder, and the fact that the only seizure that occurred was—the only seizures we know that occurred, occurred after the head injury, I would have to say that in medical probability that [Claimant] did not have a seizure disorder prior to the head injury.

Q  You said fainting can be another reason a person can blackout [sic]?

A  Yes, it can.

Q  Is there anything in her history to point to prior episodes of fainting?

A  None.

Q  Is there anything to suggest that that's the reason that she fell on February 21st, '96?

A  I don't know why she fell. In other words, you've asked me, basically, to speculate. I'm speculating on it. There may be another cause that none of us knows about. There's nothing in the information that I've been given, and I've reviewed a lot of other people's descriptions. There is nothing that tells me what happened to [Claimant].

Q  Is this what they call an idiopathic phenomenon, cause unknown?

A  Cause unknown would be good. Idiopathic has a lot of other attitudes attached to it.

Q ... [A]re you aware of the medications [Claimant] was taking at the time of the event on February 21, '96, or had taken the previous evening?

A She had been taking so many medications, and the problem is that medicines can take six weeks to wash out. So that what she was taking the previous evening is not as important as what she had been taking for the months prior to it.

....

She was taking a lot of medications that could theoretically produce the fainting spell. There are a lot of medications that in combination could produce a drop in blood pressure and a fall. The problem with it is, just as with everything else in this case, that she'd been taking these combinations for years and years.

Q Have you reviewed the records carefully enough to be able to tell me as you sit here today that the medications she was taking in the days prior to the event of 2–21–96 are the same medications that she's been taking for years?

A No. I can't say that because she's changed so often. No. I didn't mean to—

Q Well, you were going to say, I believe, Doctor, that because this hasn't happened in the past and she's had all these medications, then you don't think it's medication related.

A No. I was going to say that it makes it less likely.

Q Since we don't know the medications that she's taken in the past, since you don't know that, and since you don't know if they're the same that she was taking immediately prior to 2–21–96, can you say as a matter of medical probability it was not a medication or medication-effect-induced faint?

A There's no way that I can say in medical probability. I can't say in medi-

cal probability it wasn't. I also can't say that it was. I wasn't going to try to say that because she'd been on the medication, that it couldn't be.

What I'm trying to say is that for a medical probability to indicate that this was due to those drugs, I would have expected a previous event with the fact that over the years she had taken unbelievable combinations of medications of some high dosage. I can't rule it out. I don't know.

....

Q When you said in your report that you believed the seizure disorder was secondary to the fall, were you implying that that fall was in any way caused by her work as a medical assistant in that facility of [Employer], or were you addressing only the cause of the diagnosed seizure disorder?

A **Just the cause. I have no reason to believe that something in the work situation necessarily caused the fall. I don't know what caused the fall, but I think that her seizure disorder is secondary to the fall.**

(Bolded emphases in original.) On further examination by Claimant's attorney, Dr. Popper was asked whether it was as speculative "to conclude that [the] combination of the drugs [4] that [Claimant] may have been taking at the time caused her to faint" as it was to conclude that "she tripped and fell." Dr. Popper responded:

A **I don't know. I'm torn between the two in terms of likelihood. I think I have to agree that it's a little bit more likely that the medications did this than a slip and fall because the evidence, as I understand it even from [Claimant], indicates there was no physical or mechanical reason present at the time that would have led to a slip and fall. And I think that if there had been, she would have told me that because I'm sure she**

---

**4.** Dr. Jordan S. Popper (Dr. Popper) recalled that some of the medications that Claimant–Appellant Cathleen W. Miyamoto (Claimant) had been prescribed included Vicodin (a narcotic used for pain), Promethazine (an antinauseant), Ultram (a nonopioid analgesic), Ativan, Lomotil, Histussin (a cough medicine), Zephrex LA, Tussi–Organelle, Deconamine SR, Dynabac, and Deconamine.

**would like to be able to say what caused the fall.**

**So I think if you're going to have to go [to] likelihoods, that it's more likely that this was a combination of medications than a slip and fall, but both are possible. I don't think either one is probable. I just don't know what happened.**

(Bolded emphasis in original.)

In a letter dated September 25, 1996, Dr. Maurice W. Nicholson (Dr. Nicholson), a neurosurgeon, reviewed Claimant's extensive medical history and then stated his impressions with respect to Claimant's injuries that arose from the February 21, 1996 incident:

[Claimant] did pass out and fall at work and sustained a basal skull fracture. The exact reason for her fall is not definitely known. The differential is that of a seizure disorder causing her to fall or an effect from the multiple medications that she was taking for her congestion and cold. *There does not appear to be any relationship to her work and indeed she was just standing at a Xerox machine when she collapsed.*

I would agree that this lady does have a seizure disorder and should be continued on anti-seizure medication.

(Emphasis added.)

### D. *LIRAB's Decision*

On October 19, 1999, LIRAB issued its Decision and Order affirming the Labor Director's decision (LIRAB's Decision). Among the relevant findings of fact (FsOF) and conclusions of law (CsOL) contained in LIRAB's Decision were the following:

### FINDINGS OF FACT

. . . .

15. Claimant was evaluated by [Dr. Pierce], who prepared a report dated July 26, 1996. Dr. Pierce stated that he was unable to determine the exact cause of Claimant's fall on February 21, 1996. According to Dr. Pierce, the fall could have been due to a seizure disorder that had not been diagnosed or recognized at the time of the fall, or it could have been due to a syncopal episode. If it was a syncope, Dr. Pierce offered no explanation for the syncope, except that he did not believe that the syncope was caused by the medications she was taking, unless Claimant had abruptly ceased the Deconamine and the syncope was the result of withdrawal from the medication. Dr. Pierce stated that Claimant did not relate any history of abrupt stoppage of medication. Dr. Pierce opined that based on the available date and history of the accident, he found no evidence of any job factors that could have caused Claimant's fall on February 21, 1996.

16. [Dr. Nicholson] performed a records review and prepared a report of his opinions dated September 25, 1996. Based on his review of the records, Dr. Nicholson reported that Claimant passed out at work on February 21, 1996, and suffered a basal skull fracture. He acknowledged that the exact cause of the fall is not known. Dr. Nicholson opined that Claimant could have experienced a seizure that caused her to fall, or the fall could have been due to the multiple medications that she was taking at the time of the accident. Dr. Nicholson found no apparent relationship between the fall and Claimant's work, since she was just standing at the Xerox machine prior to her collapse.

17. [Dr. Popper] provided deposition testimony. According to Dr. Popper, he understood from information in the records and from the history provided by Claimant that she was standing at the Xerox machine, photocopying documents, at the time of the accident. He also understood that no one witnessed the fall itself, although there were other people nearby. According to Dr. Popper, Claimant sustained a basal skull fracture and is now being treated for a seizure disorder. Dr. Popper stated that while he could not determine the cause of Claimant's fall within reasonable medical probability, there were three possibilities: (1) a seizure disorder; (2) a syncopal episode; and (3) a trip and fall.

Dr. Popper explained that Claimant could have suffered a seizure on February

21, 1996, that caused her to fall. Dr. Popper opined that even though Claimant did not have a history of seizures, she could have experienced her first one on February 21, 1996. Dr. Popper acknowledged that people usually do not develop a seizure disorder at age 40, which was the age of Claimant at the time of the work injury, but he felt that it could still happen.

As for the syncopal episode, Dr. Popper opined that since medications can take weeks to leave a person's system, the medications that Claimant had taken for her cold the night before the accident, in combination with the medications that she may have taken to treat her bronchitis and gastrointestinal problems a week earlier, could have caused a syncopal episode, or fainting spell.

Finally, Dr. Popper stated that while Claimant could have tripped and fallen at work, he conceded that there was no evidence of any mechanical reason for the fall, and no evidence that Claimant tripped, since she cannot recall the accident, and no one witnessed the fall. Dr. Popper opined that based on all of the available information from [Claimant] and the medical records, he found no evidence to suggest that anything at work contributed to or caused the fall, and felt that it was more likely that the fall was due to a syncope secondary to medications than from tripping on something at work.

. . . .

19. In Claimant's affidavit, executed on October 16, 1998, she speculated that she may have tripped and fallen over loose carpet in the area around the Xerox machine. Claimant disputed the description by others that she was just standing at the Xerox machine. Claimant averred that prior to the accident, she was busy doing multiple tasks, moving constantly from the Xerox machine to a work table near the machine and to the front desk to answer phones and check in patients.

20. Claimant's statements in her affidavit differed from her deposition testimony. At her deposition, Claimant stated that she understood, based on her conversations with coworkers after the work injury, that she was standing at the Xerox machine just prior to her fall and that she fell backwards on the spot. Claimant did not at that time recall or reveal any details about the possibility of having tripped and fallen over loose carpet at work. Indeed, Claimant has admitted that she is unable to recall the moments leading up to her fall. Other than her speculative statements in her affidavit, the record contains no evidence that conditions at work contributed to or caused her to fall. For these reasons, we are unable to credit Claimant's speculative statement that she may have tripped and fallen over loose carpet on February 21, 1996.

21. Based on the medical opinions of Dr. Chun, Dr. Pierce, Dr. Nicholson, and Dr. Popper, we find that Employer has presented sufficient evidence for us to find that Claimant's fall was brought on by a personal condition, i.e., either a seizure or syncope, that was unrelated to employment. Because Claimant's fall was brought on by a personal condition, we further find that Claimant sustained an idiopathic fall on February 21, 1996.

22. Claimant did not present reliable or credible evidence to show that she did not sustain an idiopathic fall, or that job factors increased the risk or hazard of her fall.

## CONCLUSIONS OF LAW

An idiopathic fall is a fall that is brought on by a purely personal condition unrelated to employment, such as a seizure or fainting spell.[1] 1 ARTHUR LARSON & LEX K. LARSON, *LARSON'S WORKERS' COMPENSATION LAW* § 9.01 (1999); 1 *MODERN WORKERS COMPENSATION* § 110:8 (Matthew J. Canavan ed., 1993). We have found, based on the opinions of Dr. Chun, Dr. Pierce, Dr. Nicholson, and Dr. Popper, that Claimant sustained an idiopathic fall on February 21, 1996. Although none of the physicians could determine the exact cause of Claimant's fall, the medical evidence overwhelmingly attributed the fall to a condition that was personal to Claimant, even though the etiology of the condition was not known.

Having determined that Claimant sustained an idiopathic fall, we next apply the rules of compensability for such falls. The general rule is that injuries resulting from an idiopathic fall are compensable only if the employment contributed to the injuries by placing the employee in a position that increases the dangerous effects of the fall. *Id.* For example, employment contribution has been found in cases involving idiopathic falls from heights or onto dangerous or sharp objects. *Id.*

In this case, Claimant fell onto a level lightly carpeted concrete floor. Claimant has presented no evidence of an increased risk or hazard due to conditions at work. Based on the majority rule that level floors do not increase the risk of an idiopathic fall, we conclude that Claimant did not sustain a compensable idiopathic fall on February 21, 1996.

Accordingly, Claimant's claim for compensation is denied.

---

[1] It should be stressed that idiopathic falls are not the same as unexplained falls and that they are treated differently in workers' compensation law.

Unexplained falls have no known cause, but the risks associated with unexplained falls are not personal to the employee, not related to employment, and not neutral. *See supra*, 1 *MODERN WORKERS COMPENSATION* § 110:9 for a discussion of unexplained falls and neutral risks; *see also, supra,* 1 *LARSON'S WORKERS' COMPENSATION LAW* § 7.04 for a discussion of unexplained falls and the danger of confusing unexplained falls with idiopathic falls.

Also, the term "idiopathic", when used in the context of workers' compensation law, should not be confused with the medical definition of that term. In medical terminology, "idiopathic" refers to a condition without clear pathogenesis, or a disease without a known or recognizable cause. *TABER'S CYCLOPEDIC MEDICAL DICTIONARY* (18th ed.1997).

5. Claimant challenges the following Findings of Fact (FsOF) by the Labor and Industrial Rela-

## STANDARDS OF REVIEW

Appellate review of LIRAB's decision is governed by Hawaii Revised Statutes (HRS) § 91–14(g) (1993), which provides:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Pursuant to the foregoing statute,

[CsOL] are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); [FsOF] are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6).

*Korsak v. Hawaii Permanente Medical Group,* 94 Hawai'i 297, 302, 12 P.3d 1238, 1243 (2000). Moreover, LIRAB's CsOL are "not binding on an appellate court" and are "freely reviewable for [their] correctness." *Mitchell v. State Dep't of Educ.,* 85 Hawai'i 250, 254, 942 P.2d 514, 518 (1997) (internal quotation marks omitted). Thus, this court is required to review LIRAB's CsOL *"de novo,* under the right/wrong standard." *Id.* (italics in original, internal quotation marks omitted).

## ISSUES ON APPEAL

Challenging a number of LIRAB's FsOF [5]

tions Board (LIRAB):

and CsOL,[6] Claimant argues that (1) she was entitled to a statutory presumption that the injuries she sustained as a result of her fall at work were compensable; (2) based on the evidence adduced before LIRAB, the cause of her fall could not be determined with any degree of medical probability; and, therefore, (3) Employer could not meet its burden of overcoming the presumption of compensability in this case.

## DISCUSSION

### A. *The Work Nexus Requirement*

■ For an injury to be compensable under Hawai'i's workers' compensation statutes, "there must be a requisite nexus between the employment and the injury." *Tate v. GTE Hawaiian Tel. Co.*, 77 Hawai'i 100, 103, 881 P.2d 1246, 1249 (1994). This nexus requirement is currently set forth in HRS § 386-3 (Supp.2000), which provides, in pertinent part:

If an employee suffers personal injury either by *accident arising out of and in the course of the employment* or by disease proximately caused by or resulting from the nature of the employment, the employee's employer or the special compensation fund shall pay compensation to the employee or the employee's dependents as provided in this chapter.[7]

(Emphasis and footnote added.)

It is undisputed in this case that Claimant fractured her skull, ruptured her ear drum, and sustained various contusions when she fell at her place of employment on February 21, 1996. Therefore, she clearly suffered a "personal injury" on the date in question. There also appears to be no question that Claimant's injuries were the result of an "accident[,]" a word defined by the supreme court for workers' compensation purposes as "an unlooked for and untoward event which is not expected or designed." *Wong Chee v. Yee Wo Chan*, 26 Haw. 785, 793 (1923) (internal quotation marks omitted). Furthermore,

- That part of FOF No. 8 that found that "Claimant was standing at the Xerox machine."
- That part of FOF No. 9 that found that Claimant fell "[w]hile standing at the copier."
- That part of FOF No. 15 that found that "[Dr. James F. Pierce (Dr. Pierce)] opined that based on the available date and history of the accident, he found no evidence of any job factors that could have caused Claimant's fall on February 21, 1996."
- That part of FOF No. 17 that found that "Dr. Popper opined that based on all of the available information from [Claimant] and the medical records, he found no evidence to suggest that anything at work contributed to or caused the fall, and felt that it was more likely that the fall was due to a syncope secondary to medications than from tripping on something at work."
- That part of FOF No. 19 that found that *others described Claimant as* "just standing at the Xerox machine" at the time of the accident.
- That part of FOF No. 20 that found that "Claimant stated that she understood, based on her conversations with coworkers after the work injury, that she was standing at the Xerox machine *just prior to her fall and that* she fell backwards on the spot."
- That part of FOF No. 21 that found that "[Wahiawa General Hospital] has presented sufficient evidence for us to find that Claimant's fall was brought on by a personal con-

dition, i.e., either a seizure or syncope, that was unrelated to employment. Because Claimant's fall was brought on by a personal condition, we further find that Claimant sustained an idiopathic fall on February 21, 1996."

- That part of FOF No. 22 that found that "Claimant did not present reliable or credible evidence to show that she did not sustain an idiopathic fall, or that job factors increased the risk or hazard of her fall."

6. Claimant challenged the following parts of LIRAB's Conclusions of Law, set forth on pages 423 and 424 of the Record on Appeal:

We have found, based on the opinions of [Dr. Allan B. Chun], Dr. Pierce, [Dr. Maurice W. Nicholson], and Dr. Popper, that Claimant sustained an idiopathic fall on February 21, 1996. Although none of the physicians could determine the exact cause of Claimant's fall, the medical evidence overwhelmingly attributed the fall to a condition that was personal to Claimant, even though the etiology of the condition was not known.

. . . .

. . . . Claimant has presented no evidence of any increased risk or hazard due to conditions at work. . . . Claimant did not sustain a compensable idiopathic fall on February 21, 1996.

7. At the time Claimant was injured, the work nexus requirement was identical, except that the phrase "hereinafter provided" was used instead of the phrase "provided in this chapter."

Claimant has not argued that her personal injuries were the result of a "disease proximately caused by or resulting from the nature of [her] employment[.]" Consequently, the dispositive issue in determining whether Claimant met the work nexus requirement is whether Claimant's injuries [8] "arose out of and in the course of employment."

The supreme court has noted that two different approaches exist for determining whether an "injury arose out of and in the course of employment." Under the traditional two-step test, which the supreme court applied in earlier Hawai'i cases,

> a claimant is required to establish that his [or her] injury arose both "out of" *and* "in the course of" his [or her] employment. The words "out of" are deemed to signify a causal connection between the injury and the claimant's employment, while the words "in the course of" point to the injury's proximity in time, place and circumstances to the employment. Both components of the statutory formula must be separately established before compensation will be awarded.

*Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 647–48, 636 P.2d 721 (1981) (emphasis in original, citations omitted).

Under the unitary test, which the supreme court expressly adopted in *Chung*,[9] an injury "arise[s] out of and in the course of employment" if there is "a causal connection between the injury and any incidents or conditions of employment." *Chung*, 63 Haw. at 647–48, 636 P.2d at 725. Under this standard, it is not necessary to establish "temporal, spatial, and circumstantial proximity between the injury and employment." *Id.* at 648, 636 P.2d at 725. The focus is "on the injury's origin rather than the time and place of its manifestation," *id.*, and the "pertinent issue ... [is] whether the injury in fact had been caused by [an employee's] work activity, regardless of where or when the injury had taken place." *Id.* at 649, 636 P.2d at 726. That is, "if the injury reasonably appears to have flowed from the conditions under which the employee is required to work[,]" workers' compensation benefits should be awarded. *Id.*, 636 P.2d at 725 (internal quotation marks omitted).

Applying the unitary test in *Chung*, the supreme court held that the fact that the claimant suffered a heart attack "at home, on the street or elsewhere while tending to his [or her] private affairs" is "legally irrelevant[.]" *Id.*, 636 P.2d at 726 (quoting *Aka-*

---

**8.** Although Hawaii Revised Statutes (HRS) § 386-3 literally seems to require that an employee's personal injury result from an "accident arising out of and in the course of employment," more recent Hawai'i cases on the work nexus requirement seem to have eliminated the word "accident" from the requirement and focused instead on whether the employee's injury arose out of and in the course of the employee's employment. *See, e.g., Tamashiro v. Control Specialist, Inc. (Tamashiro)*, 97 Hawai'i 86, 90, 34 P.3d 16, 20 (2001); *Smith v. State Dep't of Labor & Indus. Relations*, 80 Hawai'i 150, 907 P.2d 101 (1995); *Zemis v. SCI Contractors, Inc.*, 80 Hawai'i 442, 911 P.2d 77 (1996); *Tate v. GTE Hawaiian Tel. Co.*, 77 Hawai'i 100, 881 P.2d 1246 (1994); *Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 636 P.2d 721 (1981); *Royal State Nat'l Ins. Co. v. Labor & Indus. Relations Appeals Bd.*, 53 Haw. 32, 487 P.2d 278 (1971). As one workers' compensation treatise points out, however,

> [t]he terms "injury" and "accident" are generally not synonymous as employed in workers' compensation acts. The mere fact of injury does not of itself prove that an accident occurred, and, of course, the fact that there was an accident does not prove that there was

an injury. The mere fact that one may become ill or experience pain during employment does not in and of itself prove that the employee is disabled as a result of an "accident" arising out of and in the course of employment.

1 *Modern Workers Compensation* § 108:2, at 3 (1993) (footnotes omitted).

**9.** In *Chung*, the claimant, a veterinarian, suffered a heart attack after office hours while jogging around the track at Kalani High School. At the time of his attack, he was employed as the president of Animal Clinic, Inc. and was also the sole director and stockholder of the corporation. Conflicting evidence was presented as to the cause of the claimant's heart attack. One doctor, who attributed the claimant's heart attack to pre-existing arteriosclerosis and physical exertion from jogging, stated that the cause of the claimant's heart disease was unknown and opined that work stress did not contribute to the claimant's heart attack. *Id.* at 651, 636 P.2d at 727. Another doctor testified that the claimant's employment activities, which the claimant engaged in "for long hours, as well as [the claimant's] other business-related activities, generated a substantial amount of mental and emotional stress which is strongly linked to the production of heart disease." *Id.*

*mine v. Hawaiian Packing & Crating Co.*, 53 Haw. 406, 413, 495 P.2d 1164, 1169 (1972)). Furthermore,

[t]he primary focus of medical testimony for the purposes of determining legal causation should be whether the employment situation in any way contributed to the employee's injury. Testimony that a preexisting heart disease may have been a contributing or precipitating cause of the heart attack should be accorded little probative weight. The only relevant inquiry is whether [the claimant's] heart attack in fact was aggravated or accelerated by his work activity.

*Chung*, 63 Haw. at 652, 636 P.2d at 728 (citations omitted). The unitary test adopted in *Chung*, therefore, was much more liberal than the traditional test, and the supreme court so acknowledged in *Chung*. 63 Haw. at 648, 636 P.2d at 725.

The supreme court has never overruled *Chung* or any of the earlier cases [10] upon which *Chung* relied in embracing the unitary test. However, in more recent cases, the Hawaiʻi Supreme Court, while expressly stating that it was applying the unitary test, appears to have applied the test much more restrictively.

In *Tate v. GTE Hawaiian Tel. Co.*, for example, the supreme court upheld a LIRAB decision denying benefits to a switchboard operator, who, while on pre-retirement vacation, slipped, fell, and fractured her knee when she returned to her employer's premises to deliver a cake to thank her co-workers for a retirement party they had given in her honor. 77 Hawaiʻi 100, 881 P.2d 1246 (1994). While on her employer's premises, the switchboard operator also met briefly with her employer's pension benefits administrator to discuss calculations for her retirement benefits. *Id.* at 102, 881 P.2d at 1248. The supreme court initially set forth the following test for evaluating whether the switchboard operator's injury was compensable:

**"An injury is said to arise in the course of the employment when it takes place within the period of employment, at a place where the employee reasonably may be, and while he or she is fulfilling his or her duties or engaged in doing something incidental thereto."** [11] 1 A. Larson, The Law of Workmen's Compensation § 14.00 (1993) [hereinafter Larson].

Activities, such as seeking personal comfort, "going and coming," and engaging in recreation have no inherent status as part of the employment. 1 A[.] Larson § 21.81. As distinguished from actual performance of the direct duties of the job, these activities must be established as incidents of the work itself. *Id.* In explaining the method by which an activity shall be characterized

10. In *Chung*, the Hawaiʻi Supreme Court noted that it first "moved towards adoption of the liberal, unitary concept of work-connection for interpreting the [workers' compensation] statutory requirement" in *Royal State Nat'l Ins. Co.*, where it held that workers' compensation is awardable "if the injury reasonably appears to have flowed from the conditions under which the employee is required to work[,]" 63 Haw. at 648–49, 636 P.2d at 725 (internal quotation marks omitted), and that "an employee suffers a work-related injury within the meaning of HRS § 386-3 when he sustains a psychogenic disability precipitated by the circumstances of his employment." 53 Haw. at 38, 487 P.2d at 282. The *Chung* court also referred to several prior cases in which it had utilized the unitary approach to analyze whether workers' compensation benefits should be awarded. *See, e.g., DeFries v. Ass'n of Owners*, 57 Haw. 296, 555 P.2d 855 (1976) (Kidwell, J., and Kobayashi, J., dissenting) (concluding that LIRAB erred in determining that an employee's stumble while in the course of his employment as a security guard, which resulted in a fracture of his right big toe, did not aggravate or accelerate the arthritic condition in the employee's right knee); *Pacheco v. Orchids of Hawaii*, 54 Haw. 66, 77, 502 P.2d 1399, 1405 (1972) (Levinson, J., and Marumoto, J., dissenting) (where the majority held that workers' compensation benefits were awardable where an employee was killed in a car accident after leaving her employer's premises during an afternoon coffee break to cash her paycheck at the bank); *Akamine v. Hawaiian Packing & Crating Co.*, 53 Haw. 406, 495 P.2d 1164 (1972) (holding that where an employee with a long-standing cardiovascular disease collapsed while pushing a loaded handtruck at his place of employment, benefits were awardable).

11. This test seems to be similar to the "arising out of" part of the traditional two-step approach used in earlier Hawaiʻi workers' compensation cases. It seems doubtful to us that the veterinarian-claimant in *Chung* would have qualified for workers' compensation benefits under this test.

as "incidental" to work, Larson writes: "The word 'incident' contains an element of the usual and reasonable, both as to the needs to be satisfied and as to the means used to satisfy them." *Id.*

*Tate,* 77 Hawai'i at 103–04, 881 P.2d at 1249–50 (bolded emphasis and footnote added, italics in original, some internal brackets omitted). The supreme court also explained that

> [i]njuries occurring on an employer's premises are covered by workers' compensation only insofar as they arise out of employment-related risks. Where an employee visits an employer's premises for a purely personal reason, an injury sustained during such a visit is not compensable. The pivotal issue in these cases is whether the employee's presence on the employer's premises at the time of the injury is required by the nature of the employment. For example, an injury sustained by an employee who, while on vacation, visits the employer's premises in order to gather nuts for his personal consumption is not compensable. By contrast, where an employer requires that an employee come to the workplace to pick up a paycheck, an injury sustained by the employee while on premises is compensable.
>
> Because an injury must arise out of an employment-related risk, injuries occurring during vacation are generally not compensable. Cases departing from the general rule tend to involve circumstances in which vacationing employees are required by the employer to return to the work premises during the vacation. This appeal does not involve such a case.

*Id.* at 106–07, 881 P.2d at 1252–53 (emphasis added, citations and footnote omitted). Applying the foregoing test in *Tate,* the supreme court held that the employee's injury was not causally connected to an incident or condition of employment because at the time the employee fell, she was "on vacation" and returning to the employee's lounge to retrieve a piece of cake to take home, "a quintessentially 'personal errand[,]'" *id.* at 104, 881 P.2d at 1250, which "does not amount to a 'usual and reasonable' act incidental to employment as a switchboard operator." *Id.* The supreme court also held that the employ-

ee's injury did not occur as a result of a risk associated with employment. *Id.* at 106, 881 P.2d at 1252.

Subsequently, in *Smith v. State Dep't of Labor & Indus. Relations,* 80 Hawai'i 150, 907 P.2d 101 (1995), the supreme court held noncompensable injuries suffered by an employee while crossing a public street between her workplace and a private lot where she parked her car. The employee rented a parking space in the private lot pursuant to an agreement between her employer and the parking lot owner. *Id.* at 151, 907 P.2d at 102. The supreme court in *Smith* set forth the following rules for determining compensability for injuries suffered by employees going to and from their place of employment:

> (1) injuries suffered by employees while going to or from work arise out of and in the course of the employee's employment if (a) the injury occurs on the employer's premises, and (b) the employee's presence on the employer's premises was required by the nature of the employee's employment; (2) a parking lot owned, maintained, or controlled by an employer is considered part of the employer's premises for purposes of determining whether an employee's injury suffered in a parking lot arises out of and in the course of the employee's employment; and (3) an injury suffered by an employee in a public street, sidewalk, or other off-premises location that is on a direct and/or necessary route between the employer's main premises and the parking lot owned, maintained, or controlled by the employer also arises out of and in the course of the employee's employment.

*Id.* Applying the foregoing test, the supreme court held that since the parking space rented by the employee in question was not owned, maintained, or controlled by her employer, the injuries sustained by the employee on a public street en route to her parking space did not arise out of and in the course of employment. *Id.* at 156, 907 P.2d at 107.

In *Zemis v. SCI Contractors, Inc.,* 80 Hawai'i 442, 911 P.2d 77 (1996), the supreme court upheld a LIRAB decision denying compensation to a claimant who was assaulted by a co-worker at work. The claimant in *Zemis* was driving to the construction site where he

worked when his vehicle collided with a vehicle driven by a co-worker's wife. *Id.* at 444, 911 P.2d at 79. Although the claimant was unharmed in the collision, his co-worker's wife had to be taken to the hospital. *Id.* Two days after the accident, the claimant and the co-worker, who were not acquaintances and had never conversed before, were assigned to work stations at the construction site that were approximately 1,000 feet apart. *Id.* Shortly after the work day began, the co-worker had an "exchange of words" with the claimant about the automobile accident, struck the claimant in the face with a hard hat, and severely injured the claimant. *Id.* at 446, 911 P.2d at 81. Conflicting evidence was presented as to whether the co-worker's supervisor had warned the claimant that the co-worker was angry and looking for the claimant on the morning of the assault. *Id.* at 447, 911 P.2d at 82. The Labor Director approved the claimant's application for workers' compensation benefits, concluding that "there [was] sufficient connection between claimant's injury and his employment since the assailant struck claimant with a hard hat which is a[n] instrument commonly used by workers in the construction industry." *Id.* at 444, 911 P.2d at 79. LIRAB reversed, finding that (1) the claimant was not assaulted because of his employment but as a result of a personal dispute, and (2) the "[e]mployer had no reason to suspect or foresee that [the co-worker] would assault or harm [the claimant.]" *Id.* at 446, 911 P.2d at 81.

On appeal, the supreme court, noting that the workers' compensation statutory scheme was intended to require employers to compensate their employees for job-related injuries regardless of fault, agreed with the claimant that LIRAB "erred in its use of the [tort] concept of foreseeability[.]" *Id.* at 447, 911 P.2d at 82. The supreme court concluded, however, that LIRAB's error did not warrant reversal. *Id.* Acknowledging that its determination was governed by the unitary test, the supreme court affirmed LIRAB's decision and concluded, in summary, as follows:

(1) The "evidence unequivocally indicates that the [motor vehicle] accident [between the claimant and his co-worker's wife], which was the subject matter of the dispute, was a personal matter, unconnected to [the claimant's] employment." *Id.* at 446, 911 P.2d at 81.

(2) While the employer's knowledge that the co-worker " 'was really upset' and looking for" the claimant on the morning of the assault, was " 'an added factor' to be considered in determining compensability[,]" such factor, under the facts of this case, was not "sufficient to establish a causal connection between [the claimant's] employment and the assault[,]" *id.* at 447, 911 P.2d at 82, because

> where an employee is intentionally assaulted on the job site by a third person, the resulting injury is not causally connected to the employment unless the assault itself was "directed against the employee because of the employee's employment." A personally motivated assault of an employee by a third person may be considered as having occurred "because of the employee's employment," if the animosity or dispute which culminated in the assault was "exacerbated by the employment." . . . [W]e fail to see how [the employer's] alleged knowledge that [the co-worker] was upset and looking for [the claimant] could warrant the finding that the assault was directed against [the claimant] because of his employment. Prior to the assault, [the co-worker] and [the claimant] had never before worked together—in fact, they had never before even conversed—and on the day of the assault, they were assigned to work crews approximately 1,000 feet apart.

*Id.* at 447–48, 911 P.2d at 82–83.

(3) The fact that the claimant and his co-worker worked at the same job site, thus giving the co-worker the opportunity to assault the claimant, does not justify a compensation award to the injured claimant because "even though the employment may have provided a convenient opportunity for the attack it was not the cause." *Id.* at 448, 911 P.2d at 83 (internal quotation marks omitted).

(4) "A personal assault upon an employee by a co-worker is not causally connected to the employee's employment simply because the assailant utilized an implement of the employment to deliver the injurious blow[,]" *id.;* "rather, it is the *motivation* behind the

altercation or assault" that is dispositive. *Id.* at 449, 911 P.2d at 84 (quoting *Bader–Rondeau v. Truth or Consequences,* 113 N.M. 218, 824 P.2d 358, 360 (N.M.Ct.App., 1991) (emphasis in original)).

(5) The positional risk doctrine, that "an injury arises out of the employment if it would not have occurred *but for* the fact that the conditions and obligations of the employment placed claimant in the position where he or she was injured[,]" *id.* (emphasis in original), is not applicable when

it is clear that the origin of the assault was purely private and personal, and that the employment contributed nothing to the episode, whether by engendering or exacerbating the quarrel or facilitating the assault, ... since that test applies only when the risk is "neutral." ... [A] risk is "neutral" if it is "neither personal to the claimant nor distinctly associated with the employment."

*Id.* (block formatting, citations, and internal brackets omitted).

It appears from *Tate, Smith,* and *Zemis,* therefore, that the supreme court, although continuing to embrace the more liberal unitary test, now construes the test to require, for compensability, that an injury arise out of an employment-related risk, occur within the employee's period of employment at a place where the employee reasonably may be, and take place while the employee is fulfilling his or her employment duties.

### B. *The Presumption of Compensability*

HRS § 386–85 (1993) provides, in relevant part, as follows:

**Presumptions.** *In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary:*

(1) *That the claim is for a covered work injury[.]*

(Emphases added.) In *Chung,* the Hawai'i Supreme Court stated that

HRS § 386–85(1) creates a presumption in favor of the claimant that the subject injury is causally related to the employment activity.... [T]his presumption imposes upon the employer both the heavy burden of persuasion and the burden of going forward with the evidence. The claimant must prevail if the employer fails to adduce substantial evidence that the injury is unrelated to employment. The term "substantial evidence" signifies a high quantum of evidence which, at the minimum, must be "relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable man that an injury or death is not work connected."

The statute nowhere requires ... some preliminary showing that the injury occurred "in the course of employment" before the presumption will be triggered. Rather, HRS § 386–85 clearly dictates that coverage will be presumed at the outset, subject to being rebutted by substantial evidence to the contrary. This is so in all claims proceedings, regardless of the existence of conflicting evidence, as the legislature has determined that where there is a reasonable doubt as to whether an injury is work-connected, it must be resolved in favor of the claimant.

*Chung,* 63 Haw. at 650–51, 636 P.2d at 726–27 (footnote and citations omitted). As discussed earlier, *Chung* involved a veterinarian, Dr. Chung, who suffered a heart attack while jogging after hours around a high school track. The medical testimony was conflicting as to whether Dr. Chung's heart attack was causally related to his employment. In holding Dr. Chung's heart attack injuries compensable, the supreme court held that

[i]n such cases, ... the legislature has decided that the conflict should be resolved in the claimant's favor. This is so especially in view of the special weight accorded the statutory presumption in the cases of heart disease, where the precise causes of the disease are particularly difficult to ascertain.

Our decision in *Akamine* provides ample support for this conclusion. In *Akamine,* we discussed the distinction between the etiology of heart disease and legal causation, noting that definition of the latter

rests solely with the legislature and the courts, not with medical experts.

> For "a medical man may give a generalized opinion that there was no connection between an incident at work and a heart attack, and, in his own mind, may mean thereby that a pre-existing pathological condition was the overwhelming factor in bringing about the attack and that the part played by the work was insignificant. But, while it may be sound medically to say that the work did not 'cause' the attack, it may well be bad law, because, in general, existing law treats the slightest factor of aggravation as an adequate 'cause.'"

The primary focus of medical testimony for the purposes of determining legal causation should be whether the employment situation in any way contributed to the employee's injury. Testimony that a pre-existing heart disease may have been a contributing or precipitating cause of the heart attack should be accorded little probative weight. The only relevant inquiry is whether [the claimant's] heart attack in fact was aggravated or accelerated by his work activity.

*Chung,* 63 Haw. at 652, 636 P.2d at 727–28 (citations omitted).

In *Korsak v. Hawaii Permanente Medical Group,* 94 Hawai'i 297, 12 P.3d 1238 (2000), the Hawai'i Supreme Court reviewed a decision by this court that the HRS § 386–85(1) presumption applied to the aggravation of a pre-existing low back injury sustained by a claimant while undergoing physical therapy for a compensable work injury. The claimant's employer contended that the statutory presumption applied only to "initial" proceedings or injuries, and not to subsequent proceedings conducted pursuant to the workers' compensation statute. *Id.* at 306, 12 P.3d at 1247. Rejecting the employer's contention, the supreme court stated that the statutory presumption

> "is not a mere procedural device that disappears upon the introduction of contrary evidence." *Akamine [v. Hawaiian Packing and Crating Co.],* 53 Haw. [406,] 408, 495 P.2d [1164,] 1166. . . .

HRS § 386–85(1) creates a presumption in favor of the claimant *that the subject injury is causally related to the employment activity.* . . . [T]his presumption imposes upon the employer both the heavy burden of persuasion and the burden of going forward with the evidence. *Akamine,* 53 Haw. at 408, 495 P.2d at 1166. The claimant must prevail if the employer fails to adduce substantial evidence that the injury is unrelated to employment. The term "substantial evidence" signifies a high quantum of evidence which, at the minimum, must be *"relevant and credible evidence of a quality and quantity sufficient to justify a conclusion* by a reasonable man that an injury or death is not work connected."

*Id.* at 307, 12 P.3d at 1248 (quoting *Akamine,* 53 Haw. at 408–09, 495 P.2d at 1166) (emphasis and italics in original, except for italics in brackets). The supreme court in *Korsak* further explained:

> As stated in *Chung v. Animal Clinic, Inc.,* "HRS § 386–85(1) creates a presumption in favor of the claimant that the subject injury is *causally related* to the employment activity. . . ." [63 Haw.] at 650, 636 P.2d at 726–27 (emphasis added).
>
> The statute nowhere requires . . . some preliminary showing that the injury occurred "in the course of employment" before the presumption will be triggered. Rather HRS § 385–86 clearly dictates that coverage will be presumed at the outset, subject to being rebutted by substantial evidence to the contrary. *This is so in all claims proceedings,* . . . as the legislature has determined that, where there is a reasonable doubt as to whether an injury is work-connected, it must be resolved in favor of the claimant. *Akamine [v. Hawaiian Packing],* 53 Haw. [406,] 409, 495 P.2d [1164,] 1166.

*Id.* at 650–51, 636 P.2d at 726–27 (adopting the "work-connection" approach to determining compensability because it more "fairly carries out the purposes of Hawai'i's workers' compensation laws") (emphasis added).

. . . .

We are aware, as [the employer] points out, that Hawai'i's workers' compensation presumption places a heavy burden on the employer to disprove that an injury is work-related. In most other jurisdictions, the burden is placed on the employee. *See generally,* Larson's § 80.33(a) (explaining the general rule that the "claimants must establish the work-connection of their injuries, the causal relationship between a work-connected injury and their disabilities, . . . and all other facets of their claims") (footnote omitted). In Hawai'i, however, the legislature has chosen to

> cast a heavy burden on the employer in workers' compensation cases. In its wisdom in formulating public policy in this area of the law, the legislature has decided that work injuries are among the costs of production which industry is required to bear; and if there is reasonable doubt as to whether an injury is work-connected, the humanitarian nature of the statute demands that doubt be resolved in favor of the claimant.

*Akamine,* 53 Haw. at 409, 495 P.2d at 1166. It is the legislature's prerogative to give the employee the benefit of the doubt in *any* workers' compensation claim. HRS § 386–85 does just that. Moreover, any argument that the breadth of the statute is overly harsh on employers should be addressed to the legislature and not to the courts.

*Korsak,* 94 Hawai'i at 306–07, 12 P.3d at 1247–48 (emphases and italics in original, except for italics in brackets; some internal brackets and citations omitted).

Subsequently, in *Tamashiro,* the supreme court explained that the HRS § 386–85(1) presumption "relates solely to the work-connectedness of an injury[,]" 97 Hawai'i at 91, 34 P.3d at 21, and not to the "question whether, as a result of the injury, the claimant is temporarily or permanently, or partially or totally, disabled[.]" *Id.*

### C. *Idiopathic Versus Unexplained Falls*

It has been observed that

> [a]ll risks causing injury to a claimant can be brought within three categories: risks distinctly associated with the employment, risks personal to the claimant, and "neutral" risks—i.e., risks having no particular employment or personal character. Harms from the first are universally compensable. Those from the second are universally noncompensable. It is within the third category that most controversy in modern compensation law occurs.

1 A. Larson & L. Larson, *Larson's Workers' Compensation Law* § 4.01, at 4–1 (2001).

> The first category of risks comprises all the obvious kinds of injury that one thinks of at once as industrial injury. All the things that can go wrong around a modern factory, mill, mine, transportation system, or construction project—machinery breaking, objects falling, explosives exploding, tractors tipping, fingers getting caught in gears, excavations caving in, and so on—are clearly in this category and constitute the bulk of what not only the public but perhaps also the original drafters of compensation acts had in mind as their proper concern. . . . As far as the "arising" test is concerned, this group causes no trouble, since all these risks fall readily within the increased-risk test and are considered work-connected in all jurisdictions.

*Id.* § 4.01, at 4–1—4–2.

> The second category of risks include those "origins of harm so clearly personal that, even if they take effect while the employee is on the job, they could not possibly be attributed to the employment." *Id.* § 4.02, at 4–2. For example,

> [i]f the time has come for the employee to die a natural death, or to expire from the effects of some disease or internal weakness of which he or she would as promptly have expired whether the employee had been working or not, the fact that the demise takes place in an employment setting rather than at home does not, of course, make the death compensable. Or if the employee has a mortal personal enemy who has sworn to seek the employee out wherever he or she may be, and if this enemy happens to find and murder the employee while the latter is at work, the

employment cannot be said to have had any causal relation to the death.

*Id.*

"The archtypical personal risk is the idiopathic risk, idiopathic meaning peculiar to the individual. The most common type of idiopathic injury is the idiopathic fall, which presents troublesome workers' compensation questions." 1 *Modern Workers Compensation* § 110:8, at 18 (footnote omitted). For example, "[w]hen an employee, solely because of a nonoccupational heart attack, epileptic fit, or fainting spell, falls and sustains a skull fracture or other injury, the question arises whether the skull fracture (as distinguished from the internal effects of the heart attack or disease, which of course are not compensable) is an injury arising out of the employment." 1 *Larson's Workers' Compensation Law* § 9.01[1], at 9–2.

The third group of risks are those "neutral" risks that are "neither distinctly employment nor distinctly personal [in] character." *Id.* § 4.03, at 4–2—4–3.

Illustrations of this category may be drawn from a wide variety of controversial cases. A person hard at work in the middle of a factory yard may be hit by a stray bullet out of nowhere, bit by a mad dog, stabbed by a lunatic running amuck, struck by lightning, thrown down by a hurricane, killed by an enemy bomb, injured by a piece of tin blown from someone's roof, shot by a child playing with an air rifle, murdered as a result of mistaken identity, felled by debris from a distinct explosion, or blinded by a flying beetle. *Another kind of neutral-risk case is that in which the cause itself, or the character of the cause, is simply unknown. An employee may be found to have died on the job from unexplained causes, or he or she may suffer a slip or fall for no reason that anyone, including the employee, can explain.*

*Id.* (emphasis added).

Finally, there is a category of "mixed" risks

in which a personal cause and an employment cause combine to produce the harm. The most common example is that of a

person with a weak heart who dies because of strain occasioned by the employment. In broadest theoretical outline, the rule is quite simple. The law does not weigh the relative importance of the two causes, nor does it look for primary and secondary causes; it merely inquires whether the employment was a contributing factor. If it was, the concurrence of the personal cause will not defeat compensability.

*Id.* § 4.04, at 4–3.

█ In this case, LIRAB concluded that Claimant suffered an idiopathic fall, "a fall that is brought on by a purely personal condition unrelated to employment, such as a seizure or fainting spell." In other words, LIRAB concluded that Claimant's fall fell into the second category of risks and was, therefore, noncompensable as a matter of law.

We conclude that the record does not support LIRAB's conclusion.

It is undisputed that there were no witnesses to Claimant's fall and that Claimant has no recollection of how or why she fell. Additionally, none of the doctors who examined Claimant could opine, with any degree of medical probability, what caused Claimant's fall and injuries. Although the doctors suggested three possibilities for Claimant's fall—a seizure disorder, a syncopal (fainting) episode, and a slip and fall—the doctors could only speculate as to what actually caused Claimant to fall. Furthermore, LIRAB specifically concluded that "none of the physicians could determine the exact cause of Claimant's fall" and the "etiology of [Claimant's personal condition] was not known."

If there had been testimony that Claimant fainted, experienced dizziness, or suffered a seizure before she fell, there would be some evidence to support LIRAB's conclusion that Claimant's fall was due to personal reasons. In the absence of any evidence as to the exact cause of Claimant's fall, however, we conclude that LIRAB's determination that Claimant's fall was idiopathic is wrong.

On the other hand, LIRAB's conclusion that "none of the physicians could determine the exact cause of Claimant's fall" and that the "etiology of [Claimant's personal condi-

tion] was not known" does support a determination that Claimant's fall was "unexplained."

> With unexplained injuries,
>
> it is unknown whether the risk was personal, employment-related, or neutral. The cause is simply unknown. In some jurisdictions, the worker has the burden of proof by eliminating idiopathic causes, and once the worker satisfies this burden, there is a permissible inference that the unexplained injury arose out of the employment. Some jurisdictions, especially positional risk states, hold that the worker is not required to rule out idiopathic causes for the accident, and has the benefit of a presumption that the injuries arose out of his or her employment. Other jurisdictions hold that when the reason or cause for the accident is unexplained, and it occurred during the time when the employee was at work, the fundamental theory underlying workers' compensation favors recovery rather than denial of compensation.

1 *Modern Workers Compensation* § 110:9, at 20 (footnotes omitted).

### D. *Claimant's Unexplained Injuries*

■■■ As discussed earlier, in Hawai'i, unlike in most other states, a statutory presumption exists that a claim for workers' compensation is for a covered work injury.

> This presumption imposes upon the employer both the heavy burden of persuasion and the burden of going forward with the evidence. **The claimant must prevail if the employer fails to adduce substantial evidence that the injury is unrelated to employment.** The term "substantial evidence" signifies a high quantum of evidence which, at the minimum, must be "*relevant and credible evidence of a quality and quantity sufficient to justify a conclusion* by a reasonable man that an injury or death is not work connected."

*Korsak,* 94 Hawai'i at 307, 12 P.3d at 1248 (internal brackets and citations omitted, italicized emphasis in original, bolded emphasis added). Additionally, "if there is reasonable doubt as to *whether an injury is work-connected* ... that doubt must be resolved in favor of the claimant." *Tamashiro,* 97 Hawai'i at 93, 34 P.3d at 23 (quoting *Akamine v.*

*Hawaiian Packing & Crating Co.,* 53 Haw. 406, 409, 495 P.2d 1164, 1166 (1972)).

We examine the record on appeal, therefore, to determine whether substantial evidence was adduced by Employer at the hearing before LIRAB to support LIRAB's conclusion that Claimant's injury was unrelated to her employment.

As noted before, there were no witnesses to Claimant's fall, which took place while Claimant was performing her employment duties at her place of employment during working hours. Additionally, none of the doctors who examined Claimant could opine, with any degree of medical probability, what caused Claimant's fall and injuries. There were no witnesses to Claimant's fall, and although there was substantial medical evidence adduced that Claimant had an extensive medical history, took a long list of different medications, and had engaged in some risky behavior, all of which could produce seizures or fainting spells, the undisputed evidence was that Claimant had never suffered seizures or fainting or dizzy spells prior to her fall at work. Additionally, LIRAB conceded that "none of the physicians could determine the exact cause of Claimant's fall[.]"

In light of the strong presumption of work-relatedness under the Hawai'i workers' compensation law, as well as the lack of any non-speculative evidence to explain the cause of Claimant's injury, we conclude that Employer failed to satisfy its heavy burden of adducing a "high quantum" of "relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable [person]" that Claimant's fall and consequent injuries were not work-related.

■■■ Furthermore, when LIRAB held that "Claimant did not present reliable or credible evidence to show that she did not sustain an idiopathic fall, or that job factors increased the risk or hazard of her fall," LIRAB improperly placed the burden on Claimant to demonstrate that the conditions at work caused her to fall and thereby clearly misapplied the statutory presumption that Claimant's injuries were work-related.

Accordingly, we reverse LIRAB's October 19, 1999 Decision and Order, to the extent that it determined that Claimant's injuries were noncompensable, and we remand this case to LIRAB for a determination of the amount of compensation due to Claimant.